Filed 8/29/22 P. v. Frank CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY CONSTANTIN FRANK et al.,<br><br>    Defendants and Appellants. | D076986, D076737<br><br><br>(Super. Ct. No. SCD267959)<br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING |

THE COURT:

It is ordered that the opinion filed on August 5, 2022, be modified as follows:

On page 4 of the opinion, footnote number 4 is modified to add a sentence at the end of the footnote as follows:

> We summarize the relevant facts in the light most favorable to the jury's verdict. (People v. Vu (2006) 143 Cal.App.4th 1009, 1013.)

On page 5 of the opinion, at the second full paragraph, the second to the last sentence is modified to state:

Keshawn reported that Haddock, Gerald H., Roshawn B., and someone else had driven up and shot their friend in the arm.

There is no change in judgment.

The petition for rehearing is denied.

HUFFMAN, Acting P. J.

Copies to:  All parties

2

Filed 8/5/22  P. v. Frank CA4/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE, | D076986, D076737 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD267959) |
| ANTHONY CONSTANTIN FRANK et al., | |
| Defendants and Appellants. | |

CONSOLIDATED APPEALS[1] from judgments of the Superior Court of San Diego County, Louis R. Hanoian, Judge. Affirmed in part as modified, reversed in part and remanded.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Constantin Frank.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant Donte Jerome Haddock.

---

1     On our own motion, we consolidated these appeals for purposes of supplemental briefing and disposition.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Eric A. Swenson and Allison V. Acosta, Deputy Attorneys General, for Plaintiff and Respondent.

In two separate incidents, fellow gang members Anthony Constantin Frank and Donte Jerome Haddock (together appellants), were charged with shooting to death Darris W. in 2011 and Xusha B. in 2013. A jury found appellants guilty of two counts of murder (Pen. Code, § 187, counts 1, 3),[2] two counts of conspiracy to commit murder (§ 182, subd. (a)(1), count 2, 4), and attempting to murder Malcolm H. (§§ 664/187, subd (a), 189, count 5). The jury also found true gang enhancement allegations attached to each count (§ 186.22, subds. (b)(1) & (5)), gang-related firearm enhancements (§ 12022.53, subds. (d) & (e)(1)), and a lying in wait special circumstance enhancement for both murders (§ 190.2, subd. (a)(15)). As to count 3, the jury also found true allegations that multiple murders occurred (§ 190.2, subd. (a)(3)) and that a firearm was discharged from a vehicle (§ 190.2, subd. (a)(21)). The court sentenced appellants to a total prison sentence of two consecutive life terms without the possibility of parole, plus 82 years to life for Haddock and 90 years to life for Frank.

On appeal, appellants contend the trial court erred when it: (1) denied their motion to sever the two murder counts; (2) admitted gang evidence, including a rap song; (3) admitted uncharged acts evidence; and (4) instructed the jury regarding the conspiracy to commit murder charge. Both contend that the evidentiary errors were prejudicial individually and cumulatively. Haddock also asserts the trial court erred when it denied his motion to sever his trial from Frank's trial.

---

[2] Undesignated statutory references are to the Penal Code.

2

Appellants challenge all fines, fees, and assessments imposed by the trial court under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) and claim the trial court erred by failing to hold an ability to pay hearing before it imposed various assessments, fees, and fines. They assert a remand is necessary to allow the trial court to exercise its discretion regarding striking their firearm enhancements. Finally, appellants contend that recently enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assem. Bill 333) requires reversal of the true findings on the gang enhancement allegations (§ 186.22, subd. (b)(1) & (5)) and the gang-related firearm enhancements (§ 12022.53, subds. (d) & (e)(1)) attached to all counts because the new law increased the proof requirements under the gang statute (§ 186.22).[3]

Haddock requests that we conduct an in camera review of material sealed by the trial court. He also asserts that the abstract of judgment must be corrected regarding his custody credits and that his parole revocation fine must be stricken. The People agree that we should review the sealed materials in camera and concede the errors regarding Haddock's custody credits and parole revocation fine.

We reject appellants' challenges to the trial court's rulings regarding severance, admissibility of evidence, and instructing the jury. We agree that the true findings on appellants' gang enhancement allegations (§ 186.22, subd. (b)(1) & (5)) must be reversed following the passage of Assem. Bill 333, which retroactively applies to their nonfinal judgments of conviction. All parties agree that reversal of the gang enhancement allegations requires reversal of the gang-

---

[3]    We allowed the parties to file supplemental briefing on the impact of Assem. Bill 333, and what impact reversal of the gang enhancement allegations had on the gang-related firearm enhancements attached to all counts. We received and considered these submissions.

3

related firearm enhancements. (§ 12022.53, subds. (d) & (e)(1).) The matter is remanded and the People shall have the opportunity to retry appellants on these enhancements. Should the firearm enhancements be found true after a retrial, the trial court shall consider all sentencing options under section 12022.53. On remand, the trial court shall also exercise its informed discretion to resentence the section 12022.23, subdivision (d) firearm enhancements.

We also modify the judgments to vacate one of the imposed fees based on a recent change in the law. On remand, the trial court is directed to redetermine its award of Haddock's custody credits in accordance with the views expressed herein and strike Haddock's parole revocation restitution fine imposed pursuant to section 1202.45. In all other respects, we affirm the judgments as modified.

## I. FACTUAL BACKGROUND[4]

A. *Background to the Crimes*

The San Diego Lincoln Park Bloods (LPB) and the Skyline Piru Bloods (Skyline) are rival criminal street gangs with a history of back-and-forth shootings. Appellants were LPB gang members, although Frank had initially been a part of another gang called the 5-9 Brims, a gang aligned with LPB. Glenn G. and Donny L. were LPB gang members. Gang monikers follow a generational hierarchy such as the original name "Fatal" is followed in order with Lit Fatal, Baby Fatal, and Tiny Fatal. Glenn's gang moniker was Lil Fatal, Donny's was Baby Fatal, and Frank's was Tiny Fatal. Lower named individuals, such as Frank, commit crimes for the gang to receive status within the gang and the respect of older gang members, such as Glenn and Donny.

---

[4] This section provides a general background regarding events leading to the murders and appellants' crimes. The facts related to the specific claims at issue in these appeals will be discussed in each discussion section.

Brothers Andre P., Keshawn P. and Marcel P. were members of Skyline and its closely-affiliated O'Farrell Park Banksters gang (O'Farrell). Malcolm H. was a good friend and cousin of Andre and Keshawn, and an associate of the O'Farrell criminal street gang. Appellants had been involved in an ongoing feud with Keshawn, Andre, and Malcolm for several years. In 2010 and 2011, a series of uncharged shooting took place between rival gang members.

In early February 2010, Andre was shot, but he refused to speak to the police. In mid-February 2010, during a celebration at the P. family home, the partygoers heard gunshots outside. Andre and Keshawn's friend reported that Haddock, Gerald H., Roshawn B., and someone else had driven up and shot him in the arm. When police searched the area, they found a .45 caliber shell casing.

That same night, based on a call about a possible drunk driver, the police stopped a vehicle driven by Devin G., with passengers Haddock, Gerald, and Roshawn. An inventory search of the vehicle revealed two firearms, a .45 caliber JHP Hi-Point with six rounds in the magazine and a .40 caliber Beretta with 10 rounds in the magazine. Police arrested the four occupants. A few days later, based on information provided by Andre and Keshawn's mother, police connected the alleged shooters with the individuals who had been arrested in the vehicle.

In February 2011, Haddock began dating Andre's former girlfriend, Lashayla. Andre became jealous. In mid-February 2011, Lashayla and her sister were in a car with Haddock when Andre pulled up beside them and pointed a gun at them. Lashayla's sister immediately called the police. They dropped off Haddock at Gerald's house. Andre pulled up and argued with

5

Haddock. Someone then threw a brick through the window of Gerald's house. Police later arrested Andre for this incident.

On March 15, 2011, another shooting occurred at the P. family home. Malcolm was present at the time. A P. family member had seen a blue car driving by the house on numerous occasions the week before the shooting. Malcolm told this person that Frank from LPB was in the car, and the family member told police that he saw the same blue car during the shooting. The family member claimed that he did not know Frank personally and could not identify him. In early April 2011, Andre and Keshawn's mother rammed into the back of a car driven by Lashayla with Haddock as her passenger.

B. *Darris's Murder*

On the night of April 29, 2011, a high school girl rented a party bus that picked up her friends from a College Grove parking lot. The group on the bus included Skyline gang members. When the bus returned to drop everyone off at around 12:30 a.m., appellants showed up and started a fight with the Skyline gang members. Witnesses understood the fight to be gang-related. During the fight, someone screamed that Haddock had a gun.

That same night, other high school girls rented another party bus that picked people up near a restaurant. Some of the girls had invited Frank and Haddock. Some uninvited Skyline or O'Farrell gang members appeared, including Andre, Keshawn, Malcolm, Marcel, Sai T., Tevin E., and Darris W. When the girls asked Keshawn and his friends whether Frank and Haddock could join them, they assured the girls this would be fine. When the bus made a stop at Mission Beach, one of the girls was on the phone with Frank and asked the bus driver to wait for him and his friends to join the bus, but the bus eventually left.

The police later stopped the bus and several people got off and arranged alternative transportation back to the restaurant where the bus had picked them up. One person picked up Marcel and Darris and brought them to the restaurant where they had initially boarded the party bus. One of the girls who stayed on the bus was in contact with Frank, who told her that he would meet them back at the restaurant.

At the restaurant, Darris and Marcel went to Marcel's car. Gunfire erupted. Darris, who had been sitting in the backseat of Marcel's car, had been shot. Darris suffered three gunshot wounds and bled to death from his injuries. Malcolm noticed "5-0" or "5-9" had been written in dust or condensation on the car window, which meant to him that the LPB gang was involved in the shooting.

Cell phone location data showed that Frank called Haddock before the first fight and that Haddock was in communication with Glenn. Cell phone data also placed Frank in the shopping center parking lot where the first fight took place. His phone then moved to a different location and was turned off or in airplane mode at the time of Darris's shooting. Eyewitness testimony placed Haddock with Frank during the first fight. Darris's shooting occurred shortly before 2:00 a.m. Cell phone data revealed that Haddock text messaged and had a social media transaction with Glenn after the murder at 2:09 a.m. and 2:10 a.m.

C. *Xusha's Murder*

Frank obtained a nine-millimeter handgun from Marcel B., another LPB gang member. On the night of May 4, 2013, appellants drove to a party in Haddock's Impala with their friend Alaeante E.[5] After the party, the

---

[5] Alaeante was originally charged as a codefendant in this case. In exchange for his testimony, Alaeante entered a plea to voluntary

7

group talked about the fact that Malcolm and other Skyline gang members were down the street at a hookah lounge.

Marcel and Andre and Keshawn's sister, Brittney P., and two of her girlfriends, were at the same party. After leaving the party, Brittney and her friends joined Malcolm and his friends at the hookah lounge. An unidentified person from the LPB gang was also at the hookah lounge.

From the hookah lounge, someone suggested that the group get a hotel room at a casino, so the group got into several cars to make the trip. Malcolm drove Brittney's car, with Xusha in the passenger seat, and Brittney and a friend in the rear seats. Haddock saw the cars leaving and positioned his car behind the caravan of vehicles. At the time, Haddock was driving his Impala with Frank and Alaeante as his passengers. When the caravan stopped for gas, Frank or Haddock recognized Malcolm in one of the cars. Haddock circled the block several times and then followed the caravan onto the freeway.

Frank told Alaeante to "[g]et down" and began shooting at the car driven by Malcolm. Malcolm, who had been shot in the arm, stopped the car and saw that Xusha had been shot in the head. Xusha died from the injury.

A jailhouse informant testified that while in a holding tank, Frank described how he shot at another car on a freeway. Frank told the informant that he knew the person he shot had been killed because he saw the person's head bounce backward. The informant contacted authorities about Frank's statements. After speaking to a detective about the case, the informant agreed to wear a recording device while talking with Frank. The informant

_____

manslaughter with a gang allegation, as well as a plea to pandering in an unrelated case, and a probation violation, for a sentence anywhere from four years four months to up to 16 years.

obtained no information while wearing the recording device. He explained that Frank had been removed to take part in a lineup and was "really nervous." After the recording device was removed, Frank told the informant that "Gadget" and D.J. were involved in the shooting. The informant was ultimately released to a nonviolent offender program for his remaining sentence, was relocated, and received monetary assistance for about four or five months.

## DISCUSSION

## II. *ALLEGED EVIDENTIARY ERROR*

### A. *No Prejudicial Error in Admitting Rap Song and Declining to Accept Stipulation Regarding Glenn's Gang Status*

#### 1. *Additional Background*

Haddock moved in limine to limit the scope of the prosecution's gang expert's testimony, setting forth general categories of evidence he considered to be admissible and inadmissible. Frank joined in this motion. The People moved to admit evidence to establish that: LPB was a criminal street gang; appellants acted in association with other gang members, including Glenn, Donny, and Alaeante; appellants committed the crimes to benefit the gang; and appellants killed the victims specifically intending to further, promote, or assist in criminal conduct by other gang members. To prove these elements, the People sought to present evidence of nine predicate offenses committed by LPB, including field interviews, social media postings, tattoos, writings, and prior criminal cases to establish appellants' gang membership.

At a hearing on the motions, the prosecutor offered to stipulate to seven predicate acts. In response to a defense argument concerning cumulativeness, the prosecutor explained that, to the extent the parties stipulated to predicate offenses and facts, she would not be calling witnesses

9

to discuss the details of those offenses. The prosecutor also agreed that if appellants stipulated to their gang membership this would eliminate the need for social media postings, photo screen shots, writings, and other items that would have otherwise been admissible to prove gang membership.

Ultimately, the parties stipulated that between 2006 and the present day: (1) the LPB are an ongoing organization of three or more people; (2) they have a common name, LPB, and common identifying signs and symbols; and (3) their principal activities are the commission of murders, attempt murders, and assaults with firearms. The stipulation recited seven predicate offenses, including Haddock's guilty plea to assault with means of force likely to produce great bodily injury for his participation in a 2009 drive-by shooting, and Frank's guilty plea to attempted murder for his participation in a 2013 drive-by shooting.

Before trial, the prosecutor notified the court that she wanted to introduce a rap song performed by Glenn, also known as "Little Fatal," an unnamed coconspirator to Darris's 2011 murder. She explained that the video was published on August 17, 2011, approximately three months after Darris's murder, by an individual with whom Frank had a social media conversation six hours before Darris's murder. The prosecutor planned to introduce a portion of the rap song sung by Glenn as evidence of Glenn's personal animus toward Skyline, Glenn's gang membership, and Glenn's motivation for the 2011 killing. The portion of the rap song[6] that the prosecutor sought to introduce contained the following lyrics:

> "Eastside what? Eastside of the map where the niggas try
> to say fuck Lincoln Park in they raps, but we aint trippin

---

[6] For ease of reference, we refer to the portion of the rap song presented to the jury as the "song."

cuz, we really know the facts.  Where the niggas hang out in broad daylight and get klacked.[7]  Try to come through ma hood and get messed-up with the gat, sent to the mortuary with a bullet in ya brain.  I'm Lil Fatal,[8] I'm in it for the stats not the fame.  Run up smoked ya big homeboy for the cocaine and went back to the dip where we hold them fat straps, Desert Eagles drop the triangle in ya face like that.  Ain't no love foo, so why ya fuckin with us?  Come thru and get touched nigga, it's a must.  I get the LP up and then I skate to the block I'm in a D.I.P. where Crosstowns[9] get shot.  You might go to the Lola, go through and klack, but I guarantee you come through the DIP you won't make it back.  Slip Slide D-I standing over a body screaming fuck skyline be a goddam shame how these dudes flat line and these niggas still talkin but its L's on mine."

Appellants objected, arguing that the song had an attenuated connection to them, was inflammatory, irrelevant, and cumulative of other evidence.  The prosecutor agreed that the song's lyrics did not pertain to Darris's 2011 murder but claimed it was significant that the song was again published online in 2011.  The operative complaint alleged that a conspiracy existed between appellants to murder Darris for the benefit of LPB.  The prosecutor argued that she had an obligation to prove that Glenn and Donny—alleged uncharged coconspirators in the conspiracy to kill Darris— were LPB gang members, that two witnesses had claimed they were not gang members, and that the animus of the uncharged coconspirators toward

---

7       "Klacked" means killed.

8       "Lit Fatal" refers to Glenn.

9       "Crosstowns" refer to any member of a rival gang.

11

Skyline was relevant to the case. She also argued that the prosecution needed to establish the origin of the conspiracy.

After the trial court ruled that the song could be introduced because it was highly probative regarding the motive of a coconspirator and not unduly prejudicial under Evidence Code section 352, appellants offered to stipulate that Glenn was a LPB gang member to eliminate the need to introduce the song. The trial court impliedly rejected this suggestion, stating:

> "What will come out with this particular rap [song] is something that I think is going to be unique in the course of this trial where we have evidence in the first person of an individual who has some relationship with this particular case, in their own voice, saying something that is highly relevant in the case in terms of what motivation there might be that's going on. And it will be in Glenn['s] . . . words, not in an officer saying, 'Yes, we had a contact in 2005 or 2011 and this is what they said.' We have it with the individual saying it. [¶] I think it's highly relevant. If that means that there needs to be an explanation because somebody else is mentioned in here or somebody else is part of the extended video, well, that's up to you in terms of how you react to that. But I think that this is highly probative on the issue of Glenn['s] . . . motivation. It is—it is probative, I think, on the motivation of both [appellants] in terms of their complying with [Glenn's] wishes. And I don't see that undue prejudice as a result of the playing of this particular rap under [Evidence Code section] 352. As you said, 60 percent of this trial is going to be all about the animus between the two gangs."

The prosecutor introduced the song during the testimony of its gang expert. The gang expert first reviewed some social media communications between Frank and Glenn dated April 28, 2011, the day before Darris's murder, and referred to a conversation that Frank had with Donny. The gang expert discussed the song, the prosecutor played the song for the jury, and presented a transcript of the audio to the jury. The gang expert then

opined that Glenn was a LPB gang member at the time of Darris's murder. During cross-examination, the gang expert stated that no evidence existed showing that Haddock was involved in promoting or producing the song. The gang expert also stated that rappers may rap about conduct in which they do not actually participate and that a "studio gangster" may rap about incidents to which he has no connection.

2. *Analysis*

Appellants contend that the trial court erred in admitting the song because the stipulation and other gang evidence established the gang rivalry which rendered the song irrelevant or cumulative in proving the animus between the LPB and Skyline gangs. Haddock also asserts that the prosecution failed to lay a foundation or properly authenticate the song prior to its admission.

"Under the Evidence Code, authentication of a writing—including documents, audio recordings, and 'every other means of recording upon any tangible thing' (Evid. Code, § 250)—is required before the writing may be admitted in evidence ([Evid. Code], § 1401). 'Authentication is to be determined by the trial court as a preliminary fact ([Evid. Code,] § 403, subd. (a)(3)) and is statutorily defined as "the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is" or "the establishment of such facts by any other means provided by law" ([Evid. Code,] § 1400). The statutory definition ties authentication to relevance.' " (*People v. Flinner* (2020) 10 Cal.5th 686, 727 (*Flinner*).) "The first step is to determine the purpose for which the evidence is being offered. The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267 (*Goldsmith*); *Flinner*, at p. 727.) "The foundation

13

requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered. [Citation.] Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' " (*Goldsmith*, at p. 267.)

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Goldsmith*, *supra*, 59 Cal.4th at p. 266.)

The prosecution's theory regarding Darris's murder is that Glenn and Donny, respected gang members, acted as unnamed coconspirators who directed Frank to commit the murder and recruit others, such as Haddock, to help him. The People presented evidence that Glenn and Donny were LPB gang members. Glenn's gang moniker was Lil Fatal, Donny's was Baby Fatal, and Frank's was Tiny Fatal. The gang expert explained the generational hierarchy of gang monikers, noting the original name "Fatal" is followed in order with Lit Fatal, Baby Fatal, and Tiny Fatal. Lower named individuals, such as Frank, commit crimes for the gang to receive status within the gang and the respect of older gang members, such as Donny and Glenn. Other evidence established that Frank identified Glenn as Lit Fatal. The song's lyrics identified the singer as Lit Fatal, meaning Glenn.

14

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, . . . having *any tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.) The song established Glenn's motivation for the murder (his personal animus toward Skyline) and the gang expert's testimony established Frank's motivation to comply with Glenn's wishes. Appellants have not explained how this evidence of motive and intent was cumulative to other evidence in the case.

"[A] writing may be authenticated by its contents and circumstantial evidence, including the testimony of witnesses *other than* the person or persons who created the writing or witnessed its creation." (*People v. Cruz* (2020) 46 Cal.App.5th 715, 729 (*Cruz*); *Goldsmith, supra,* 59 Cal.4th at p. 268 [Foundation "may be supplied by other witness testimony, circumstantial evidence, content and location."].) Here, the content of the song along with the circumstantial evidence described above adequately supplied the necessary foundation for admission of the song. Haddock's argument that the song existed well before Darris's 2011 murder is of little import. Regardless of whether the song's lyrics were written before or after the murder, they were adequately authenticated as Glenn's work. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1138 [defendant's statements that he did not like police officers and wanted to kill one, made years before and years after he attempted to do so, properly admitted as relevant to his state of mind].) Additionally, the gang expert's failure to testify that she recognized the singer as Glenn and the fact conflicting inferences could be drawn regarding the song's authenticity went to the weight of the evidence, not its admissibility. (*Goldsmith, supra,* 59 Cal.4th at p. 267.)

15

Because sufficient evidence existed to sustain a finding that the song was what the prosecution claimed it to be, the trial court properly allowed its authenticity and the identity of the singer to become questions of fact for the jury. (See Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code, (1995 ed.) foll. § 1400, p. 440 [trier of fact "may find that the writing is not authentic despite the fact that the judge has determined that it was 'authenticated' "].)

Appellants next contend that the trial court erred in admitting the song under Evidence Code section 352, claiming the song was inflammatory and highly prejudicial because it portrayed them as having a propensity for violence. Frank also suggests that the song could trigger latent racial bias toward African Americans in the jurors.

"Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) " '[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Jones* (2017) 3 Cal.5th 583, 610.)

A trial court's exercise of discretion under Evidence Code section 352 will not be overturned on appeal absent a manifest abuse of that discretion.

16

(*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314 (*Jennings*).) " 'It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. [Citation.] "A 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People v. Fields* (2009) 175 Cal.App.4th 1001, 1018.)

We find no error in admitting the song because it was relevant to establishing Glenn's personal animus and not likely to invoke a purely emotional bias against appellants. The gang expert testified that Haddock was not involved with the song and rappers often do not carry out the conduct that they sing about. The lyrics did not mention appellants, and addressed shooting and killing Skyline members in generic terms. (Compare, *People v. Coneal* (2019) 41 Cal.App.5th 951, 971 [graphic lyrics impermissibly offered to show the defendants had violent dispositions].)

Introduction of the lyrics and audio clip likely took less than 10 minutes in an otherwise lengthy trial covering over 6,000 pages of reporter's transcript. Although the entire rap song included different singers and the sound of sirens and gunshots, the prosecutor limited the evidence to Glenn's brief portion that supported her theory of the case and did not include other sounds. The prosecutor did not mention the song in her closing argument and told the jurors in her rebuttal argument to "acquit" appellants "[i]f you believe that I am asking you to find these men guilty of two murders because of a rap song." Instead, the prosecutor argued:

> "That song was not played in my opening statement. That song was played with a gang expert, who was required to testify about elements of a crime that we were trying to

17

establish that the two men that ordered the 2011 killing were members of the gang. And that they had a motive. And yes, they rapped about it. And you did get to hear that. Does that by itself create guilt? Absolutely not. Is it a piece of relevant evidence that you get to consider? It is."

Further, the trial court instructed the jury not to let bias, sympathy or prejudice influence their decision, including bias based on race or ethnicity. (CALCRIM No. 200.) We presume that the jurors followed this instruction in the absence of any evidence to the contrary. (*People v. Krebs* (2019) 8 Cal.5th 265, 335 (*Krebs*).) On this record, we are not persuaded by Frank's speculative argument that the song could trigger latent racial bias toward African Americans in the jurors.[10] We conclude that the trial court

---

[10] Frank complains that other prosecution evidence exacerbated the racial prejudice of the song, specifically noting that prosecution exhibit 565 consisted of 132 pages of text messages downloaded from Haddock's cell phone in April 2013. Frank admits that parts of this exhibit were "marginally relevant to disputed issues" but other parts of the exhibit contain text messages "filled with jargon and abbreviations associated with Blacks" that depict the participants in the conversations "as morally unacceptable reprobates who are prostitutes, strippers, and promiscuous."

While we are sensitive to how jurors might perceive the participants in these text messages it is incumbent on defense counsel raise such issues to the trial court. Frank did not object to the admission of any part of this exhibit and Haddock objected based on hearsay and the right to confrontation. Neither defendant sought to exclude any portion of exhibit 565 based on how the evidence might impact racial stereotypes. Had Frank raised his current concerns in the trial court the parties could have redacted portions of exhibit 565. (*People v. Holford* (2012) 203 Cal.App.4th 155, 169–170 [noting that a timely and specific objection is required to preserve an Evidence Code section 352 claim on appeal and holding that "when making a Evidence Code section 352 objection grounded upon the existence of an evidentiary alternative [e.g., redaction], the requirement in [Evidence Code] section 353, subdivision (a), to state specific reasons for an objection necessarily requires the objecting party to identify the evidentiary alternative with specificity"].)

18

reasonably determined that the probative value of the song outweighed its potentially prejudicial effect and admission of the song was not an abuse of discretion under Evidence Code section 352.

To avoid admission of the song, appellants offered to stipulate that Glenn was a gang member. Frank argues that the trial court erred in refusing to compel the prosecution to accept appellants' proposed stipulation regarding Glenn's gang status. We disagree.

"Neither the prosecutor nor the trial court [is] legally obligated" to accept a stipulation. (*People v. Rogers* (2013) 57 Cal.4th 296, 329–330 [prosecutor could properly reject offer to stipulate that charged murder was a first degree or nothing type of case, instead opting to prove intent with prior acts evidence of defendant's prior uncharged murders].) Additionally, a trial court is not authorized to enforce such a stipulation over the prosecutor's objection. (*Ibid.*) Rather, " '[a] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.' " (*Id.* at p. 330, quoting *Old Chief v. United States* (1997) 519 U.S. 172, 186–187 [conventional evidence "tells a colorful story with descriptive richness"; it "has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum"].)

Moreover, the prosecution is "not obligated to present its case in the sanitized fashion suggested by the defense" when the probative value of the evidence "clearly extended beyond the scope of the defense's offers to stipulate." (*People v. Garceau* (1993) 6 Cal.4th 140, 182, overruled on another point in *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118.) Here, the prosecutor explained that Glenn was a person that appellants looked up to and followed, and the song was evidence of Glenn's personal desire and intent. Accordingly, appellants' proposed stipulation that Glenn was a LPB

gang member did not negate the relevance of the song because its probative value extended beyond the scope of the stipulation.

B. *Any Error in Admitting the Song Was Harmless*

Even assuming the trial court erred in admitting the song, the assumed error did not render the trial fundamentally unfair or cause prejudicial harm to appellants. Ordinarily, the erroneous admission of evidence is reviewed for prejudice under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), which requires reversal only if the defense shows it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*Id*. at p. 836.) The admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test . . . ." (*Id*. at p. 439.)

The song constituted one piece of the People's case and was not the strongest evidence establishing appellants' guilt for both murders. Rather, the People argued that the evidence established that Glenn ordered a hit on one of the P. brothers based on a social media exchange between Frank and Glenn the day before Darris's murder. Specifically, a message from Frank to Glenn stated, "babyfatal [i.e., Donny] Blood gave me 48hours." Glenn stated, "K . . .where all the lil niggas fr the turf. Ckall a meetn between yall then hit me. We fina get it right." Frank responded, "yeadat when ou want iht calld ?? tonight or tomorrow ? they around here somewhereonlinckoln ihts only aye few of us who's really wit the shit othas is scared and shit." Glenn replied, "They gota go. But the ones that is. . .gota show up. Get wit yo niggas 2nite. Then ima have yall ckum to where im at." The prosecution interpreted these

20

messages to mean that Donny (Baby Fatal), gave Frank 48 hours to commit a murder and that Frank should recruit individuals to help.

The jury also heard testimony that on the evening of Darris's murder, Frank and Haddock were involved in a gang-related fight and that Haddock had a gun. Cell phone location data showed that Frank called Haddock before this fight and that Haddock was in communication with Glenn.

Thereafter, Frank was in communication with one of the girls on the second party bus throughout the evening. Frank told this girl that he had gotten into a fight at a different party bus and that he planned to meet them back at the restaurant. Frank was aware that Skyline gang members were on the bus. Haddock was also texting another girl on this party bus and she provided him information if he wanted to join them on the bus.

Marcel and Darris returned to the restaurant and went to Marcel's car. Gunfire erupted, hitting both sides of Marcel's car. Darris, who had been sitting in the backseat of Marcel's car, had been shot. The driver's side rear door of Marcel's car had a bullet hole just above the door handle. The passenger side of the car had six bullet holes. Police later recovered six .40 caliber casings and one .9mm casing from the scene.

Despite almost constant use during the evening, Frank's cell phone was turned off or in airplane mode at the time of Darris's shooting which occurred shortly before 2:00 a.m. Haddock's phone showed a similar pattern of constant use, including calls between him and Glenn, until 1:11 a.m. when the phone was disconnected from the network until 1:57 a.m. Shortly after the murder, at 2:09 a.m. and 2:10 a.m., Haddock had a text message and social media transaction with Glenn.

The evidence connecting appellants to Xusha's murder was even more compelling. Appellants had been involved in an ongoing feud with Keshawn,

Andre, and Malcolm for several years. Appellants and Alaeante learned that Malcolm and other Skyline gang members were down the street at a hookah lounge. Haddock saw cars leaving the hookah lounge and positioned his car behind the caravan of vehicles. Frank and Alaeante were his passengers. When the caravan stopped for gas, Frank or Haddock recognized Malcolm in one of the cars. Haddock circled the block several times and then followed the caravan onto the freeway. Frank told Alaeante to "[g]et down" and began shooting at the car driven by Malcolm. One bullet hit Malcolm's arm, another entered Xusha's head, killing him.

Police found gunshot residue in Haddock's car. Police later discovered that Haddock tried to sell his car a few days after Xusha's murder. Review of Haddock's cell phone data indicated that his phone was not connected to the network when the shooting took place. Although Haddock's girlfriend told law enforcement that she was continuously with Haddock starting at 1:00 a.m. on the day of Xusha's murder, their messages to each other indicated that they were not together.

Given the limited duration of the song, along with the other evidence of appellants' guilt, there is no reasonable probability that the jury's verdict would have been more favorable to appellants in its absence. (*Watson, supra*, 46 Cal.2d at p. 836.)

C. *No Abuse of Discretion in Admitting Evidence of Predicate Offenses and Other Gang Evidence*

Haddock asserts that the trial court should have excluded many of the predicate offenses and other gang evidence pursuant to Evidence Code section 352 as cumulative and irrelevant because the parties' stipulation covered every element of the gang allegation except specific intent. He also argues that the gang expert provided "further irrelevant, cumulative, and

22

highly inflammatory evidence" regarding elements of the gang allegation, gang violence, and gang terminology and culture that should have been excluded under Evidence Code section 352 as cumulative, irrelevant, and unduly prejudicial.

The People contend Haddock forfeited these evidentiary challenges by not objecting on these grounds in the trial court. They also assert we should treat these arguments as waived because Haddock failed to provide any argument or analysis explaining how the trial court erred in admitting any piece of evidence. Haddock disagrees, noting that defense counsel filed an extensive in limine motion seeking to limit the "avalanche" of gang evidence. He claims that when the trial court indicated at the hearing that it preferred a stipulation and was not leaning toward narrowing the gang evidence, counsel was "placed in a lose-lose situation" and further objection would have been futile. Haddock submits that the trial court abused its discretion by not adhering to its gatekeeping function by limiting the gang evidence in this case regarding gang predicates, gang testimony, and prior act evidence.

"A party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless: 'There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion.' The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal."

23

(*People v. Morris* (1991) 53 Cal.3d 152, 187–188 (*Morris*), disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

A motion in limine to exclude evidence is sufficient to preserve an objection if the motion (1) is directed to a particular, identifiable body of evidence; (2) states a specific legal ground for exclusion that is subsequently raised on appeal; and (3) is made at a time before or during trial when the trial court can determine the evidentiary issue in its appropriate context. (*Morris, supra*, 53 Cal.3d at p. 190.) If each of these conditions is satisfied, defense counsel would be "justified in concluding that a mere repetition of the same objection advanced on the motion in limine would serve no useful purpose." (*Id.* at p. 189.)

In this matter, Haddock filed an in limine motion to limit gang evidence that generally set forth the scope of admissible and inadmissible gang expert testimony. Regarding inadmissible gang expert testimony, Haddock argued that gang experts may not testify as to the knowledge or intent of specific defendants or as to the motives of specific defendants, and that their testimony must be based on facts and not speculation. He also argued that hypothetical questions must be rooted in facts and that gang experts cannot present case-specific hearsay without an applicable hearsay objection.

Haddock's motion in limine was wholly insufficient to preserve an Evidence Code section 352 objection because he never raised this objection in his motion. Nonetheless, as we have already noted, the discussion at the hearing on the in limine motions focused on stipulating to certain matters to eliminate the need for the prosecution to present evidence on these matters. (*Ante*, pt. II.A.1.) Haddock's counsel questioned what evidence would be admitted if the parties stipulated to certain matters, stating it presented an

24

Evidence Code section 352 issue regarding the level of evidence that needed to be presented and expressing concern that the gang has "done horrible, horrible stuff" and there is other "horrible stuff related to the case." The trial court understood counsel's concern, stating that evidence may be relevant on more than one theory and the question presented is the amount of detail that the prosecution needed to present to prove issues such as gang status, the primary activities of the gang, and gang membership. For example, if the parties stipulated to appellants' gang membership, this eliminated the need for the prosecution to present evidence on this issue such as field interview related to other cases, social media postings, tattoos, and writings.

At trial, Haddock never objected to the scope of the gang evidence presented as cumulative given the parties' stipulation. Nor did he object to any portion of the gang expert's testimony as irrelevant or unduly prejudicial. Assuming for the sake of argument that Haddock has not forfeited an Evidence Code section 352 objection to any part of the stipulation or gang evidence, we reject his contention that the gang evidence was cumulative or otherwise inadmissible and thus analogous to the situations addressed in *People v. Williams* (2009) 170 Cal.App.4th 587 (*Williams*) and *People v. Leon* (2008) 161 Cal.App.4th 149.

In *Williams*, *supra*, 170 Cal.App.4th 587, a jury convicted the defendant of several substantive offenses, including active gang participation, and found true gang benefit enhancement allegations. (*Id.* at p. 595.) As part of its proof, the prosecution presented evidence of three prior crimes involving the defendant, 15 arrests or contacts with law enforcement involving the defendant, and eight predicate offenses, three of which either directly or indirectly involved the defendant. (*Id.* at pp. 598–599, 601–602.) The defendant in *Williams* "challenged the cumulative impact of admitting

evidence of dozens of prior crimes," some of which were introduced "multiple times and for multiple purposes." (*Id.* at pp. 598, fn. 5, 610.) The appellate court found "plain" but harmless error in the admission of "unnecessary quantities of evidence" that "turned the trial of this routine drug and weapons possession case into a weeks-long marathon." (*Id.* at p. 595.) The court further concluded that it was an abuse of discretion (but a harmless one) "to admit cumulative evidence concerning issues not reasonably subject to dispute." (*Id.* at p. 611.)

The instant trial did not involve a situation where a prosecutor "over-prove[d]" the case against appellants, creating a problem of cumulative, prejudicial evidence. (See *Williams*, *supra*, 170 Cal.App.4th at pp. 610–611.) The prosecutor did not call a list of witnesses, each of whom presented in turn a "repeat of previous evidence." (*Id.* at p. 610.) Nor did appellants' trial involve a situation where the "sheer volume of evidence extended the trial— and the burden on the judicial system and the jurors—beyond reasonable limits . . . amount[ing] to a virtual street brawl." (*Id.* at p. 611.)

Here, the gang expert's testimony on direct examination took only 50 pages of the reporter's transcript. After describing her background to establish her expertise in gang related matters, the gang expert testified regarding the legal definition of a gang and then the prosecutor read the parties' stipulation to the jury. The gang expert then provided general information about the LPB gang including its size, the existence of generational cliques within the gang, gang colors, and gang monikers. The gang expert testified regarding appellants' gang monikers, naming conventions within a gang, and provided information regarding other LPB gang members which ultimately led to the expert's testimony regarding the song and Glenn being a LPB gang member. The expert addressed gang

territories, the rivalry between LPB and Skyline, including the P. family. Finally, the gang expert provided general information regarding gang culture, including the concept that gang members commit crimes to gain respect within the gang.

This testimony was not irrelevant, cumulative, inflammatory or time consuming. Unlike *Williams*, *supra*, 170 Cal.App.4th 587, the record does not support the conclusion that the trial court here believed that the prosecution had the right " 'to over-prove [its] case.' " (*Id.* at p. 610 [prosecutor spent almost two full days on evidence that was a repeat of previous evidence].)

Haddock's reliance on *People v. Leon*, *supra*, 161 Cal.App.4th 149 is similarly misplaced. In *People v. Leon*, the trial court admitted evidence of the defendant's prior juvenile adjudication as relevant to establishing the predicate offenses necessary to establish the section 186.22, subdivision (b)(1) gang sentence enhancements and the gang membership elements charged in connection with two charges. (*Id.* at p. 165.) The trial court, however, excluded the evidence under Evidence Code section 1101, subdivision (b). (*Id.* at pp. 165–166.) The appellate court found admission of the defendant's prior juvenile adjudication to be harmless error because the prosecution had other "overwhelming" evidence to support the defendant's gang activity, including: 12 contacts between defendant and the police related to gang activity, defendant's admission of gang membership, presence of a gang tattoo, and association with other gang members on four separate occasions. (*Id.* at pp. 166, 169–170.)

Unlike *People v. Leon*, *supra*, 161 Cal.App.4th 149, the gang expert provided no details regarding Haddock's gang activities. Additionally, as we later discuss, Haddock's participation in the February 2010 shooting at the P. home was admissible under Evidence Code section 1101, subdivision (b)

because it supported a reasonable inference that when he committed the charged crimes, he was actively and knowingly participating in, and promoting, the criminal activity of LPB, and participated in the murders for the benefit of LPB with the specific intent to promote the criminal activity of its members and enhance his own reputation in the gang. (*Post*, pt. II.D.3.) Thus, *People v. Leon* is inapposite.

Accordingly, we reject Haddock's arguments. Because there was no error under state evidence law, appellants' derivative claim under the federal Constitution is also meritless. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1311.)

D. *No Abuse of Discretion in Admitting Prior Uncharged Crimes Evidence*

1. *Additional Background*

Appellants moved in limine to exclude any evidence of prior uncharged crimes. At a hearing on the motions, the parties discussed stipulating to various facts to streamline the evidence. The prosecutor, however, objected to any stipulation that eliminated her ability to introduce evidence of two shootings that occurred near the P. family home in 2010 and 2011, arguing that these shootings were relevant under Evidence Code section 1101, subdivision (b). She explained that her theory of the case involved a specific rivalry between appellants and the P. family. The defense argued the prior act evidence simply "pil[ed] on" gang evidence to the point where appellants would be deprived of due process and a fair trial. The trial court agreed that the evidence met the foundational requirements to be admitted under Evidence Code section 1101 to show appellants' motive and intent, and their identity.

28

At trial, the jury heard evidence about the two uncharged shootings that occurred at the P. family home in February 2010 and March 2011 that involved appellants. (*Ante*, pt. I.A.) The trial court later instructed the jury to "not conclude from this evidence that [appellants have] a bad character or [are] disposed to commit crime." (CALCRIM Nos. 375.) This instruction informed the jury that it could consider evidence of appellants' prior uncharged acts for the "limited purpose" of deciding whether appellants, among other things, had acted with the intent to kill or had a motive to commit the charged offenses, and only if the People proved the occurrence of the uncharged acts by a preponderance of the evidence. (*Ibid.*) CALCRIM No. 1403 similarly informed the jury of the limited purposes it could consider gang evidence and to "not conclude from this evidence that [appellants are persons] of bad character or that [they have] a disposition to commit crime.

2. *Legal Principles*

A trial court retains broad discretion in determining the relevancy of evidence. (*People v. Scheid* (1997) 16 Cal.4th 1, 14.) Evidence that the defendant committed prior bad acts is inadmissible when offered solely to prove the defendant's criminal disposition to commit such an act (Evid. Code, § 1101, subd. (a); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393, 399 (*Ewoldt*), superseded by statute on other grounds), but is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than [the defendant's] disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) "To be relevant to prove identity, the uncharged crime must be highly similar to the charged offenses, while a lesser degree of similarity is required to establish relevance to prove common design or plan, and the least

29

similarity is required to establish relevance to prove intent." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1123 (*Lenart*).)

If the trial court determines that uncharged misconduct is admissible under Evidence Code section 1101, subdivision (b), it must then determine whether the probative value of the evidence is substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, confusing the issues, or misleading the jury. (*Ewoldt*, *supra*, 7 Cal.4th at p. 404; Evid. Code, § 352.) " 'The "prejudice" referred to in . . . [Evidence Code] section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638 (*Karis*).) "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

"The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*Jennings*, *supra*, 81 Cal.App.4th at p. 1314.) The record must affirmatively show that the trial judge did in fact weigh prejudice against probative value, but no more is required. (*People v. Clair* (1992) 2 Cal.4th 629, 660.) " 'On appeal, the trial court's determination of th[e] issue [of the admissibility of other

uncharged crimes], being essentially a determination of relevance, is reviewed for abuse of discretion.' " (*Lenart*, *supra*, 32 Cal.4th at p. 1123.)

3. *Analysis*

Appellants assert that the trial court incorrectly concluded that the drive-by shootings were admissible under Evidence Code section 1101, subdivision (b). The People disagree, claiming that these uncharged acts were relevant to appellants' motive and intent. We agree with the People.

"Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense." (*Ewoldt*, *supra*, 7 Cal.4th at p. 394, fn. 2, italics in original.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Id.* at p. 402.) To be admissible to prove intent, the uncharged misconduct need only be "sufficiently similar [to the charged offense] to support the inference that the defendant ' "probably harbor[ed] the same [or similar] intent in each instance." ' " (*Ibid.*) Additionally, although motive is generally not an element of any crime, evidence of motive is relevant because it " 'makes the crime understandable and renders the inferences regarding defendant's intent more reasonable.' " (*People v. Riccardi* (2012) 54 Cal.4th 758, 815, abrogated on another point by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

The evidence of the uncharged shootings, directed toward the P. family or their property, was relevant to the issue of appellants' intent and motive with respect to the murder charges and the allegations that they actively participated in a criminal street gang in violation of section 186.22, subdivision (a), and to the gang enhancement allegations. (§ 186.22, subd. (b)(1)(A) & (C).) As appellants note, the parties' stipulation and other evidence established a rivalry between LPB and Skyline. The stipulation and

this evidence, however, did not render evidence of appellants' intent and motive irrelevant. Appellants' stance at trial that they were not guilty of the charges or allegations put the question of gang motivation at issue. Appellants never stipulated that the murders were committed in association with and for the benefit of a criminal street gang.

There is no evidence that appellants had a motive to shoot Darris or Xusha. Evidence of the two prior uncharged shootings admitted under Evidence Code section 1101, subdivision (b) supported a reasonable inference that, when appellants participated in shooting Darris and Xusha, without any apparent reason or provocation, they were actively and knowingly participating in, and promoting, the criminal activity of LPB, and that they participated in the murders for the benefit of LPB with the specific intent to promote the criminal activity of its members and enhance their own reputations in the gang. (See *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211–1212.)

The similarity requirement is satisfied because the evidence showed that the uncharged shootings (directed toward the P. family or their property) were sufficiently similar to the charged crimes (directed toward cars owned by P. family members), to support the inference that appellants probably harbored the same or similar intent, and in each instance acted with a similar motivation. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 402.) To the extent appellants argue that the trial court erred by admitting evidence of the uncharged shootings because they were too dissimilar to the lying-in-wait murders to be admissible to show modus operandi or identity of the shooters, any error was harmless because the evidence was admissible on motive and intent.

Appellants have not convinced us that the uncharged acts evidence was unduly prejudicial under Evidence Code section 352.[11] The testimony describing the uncharged acts "was no stronger and no more inflammatory than . . . testimony concerning the charged offenses." (*Ewoldt*, *supra*, 7 Cal.4th at p. 405.) Thus, it is unlikely that the jury would disregard the court's "limited purpose" instructions regarding the uncharged acts and gang evidence and convict appellants due to irrational emotional bias. (*Karis*, *supra*, 46 Cal.3d at p. 638.) The trial court's limiting instructions further minimized any prejudice to appellants. The trial court instructed the jury that the evidence of appellants' uncharged offense "is not sufficient by itself to prove that [appellants are] guilty of [the charges] or that the [allegations

---

[11] Frank contends the trial court committed reversible error when it admitted the uncharged crimes evidence without considering the Evidence Code section 352 criteria. This argument ignores what took place at the hearing on the in limine motions where the trial court discussed with defense counsel for Frank and Haddock their respective concerns regarding "piling on" evidence that might prejudice each defendant's ability to have a fair trial. The heart of these discussions involved balancing the prejudicial nature of gang evidence and the prosecution's need to prove its case. Although the trial court did not expressly weigh the prejudicial impact of the uncharged acts evidence against its probative value, we believe the requisite showing can be inferred from the record. (*People v. Mickey* (1991) 54 Cal.3d 612, 656 ["the trial [court] need not expressly weigh prejudice against probative value—or even expressly state that [it] has done so"].) Nothing in this record indicates that the trial court misunderstood its responsibilities under Evidence Code section 352.

Frank also asserts that the 2011 drive-by shooting was particularly prejudicial due to the lack of evidence connecting him to the incident. The People argue, and we agree, that sufficient evidence existed for the jury to reasonably infer Frank's identity as a participant in this incident. (*Ante*, pt. I.A.) To the extent the jurors may have been unconvinced that Frank participated in this uncharged act, CALCRIM No. 375 informed them "to disregard this evidence entirely."

33

have] been proved. The People must still prove [each charge and allegation] beyond a reasonable doubt." (CALCRIM No. 375.)

We conclude that it is not reasonably probable the result would have been more favorable to appellants had the prior crimes evidence been excluded. (*Watson, supra,* 46 Cal.2d at p. 836.) Because we find there is no evidentiary error, there is no due process violation. (*People v. Rogers* (2013) 57 Cal.4th 296, 332 [no due process violation when evidence was material, probative, and properly admitted].)

Even assuming for the purpose of argument that the trial court erroneously admitted evidence of the two uncharged crimes, the assumed error was harmless under any standard in light of the evidence adduced at trial. (*Ante,* pt. II.B.) "It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. (Evid. Code, §§ 353, subd. (b), 354.) '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001, abrogated on other grounds by statutory repeal as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509.) Given the totality of the other evidence against appellants, this is not an instance where evidence of the uncharged offenses would raise concerns that it evoked in the jury " 'a "tendency to condemn [appellants, regardless of whether] . . . [they are] believed guilty of the present charge[s]. . . ." ' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1331.)

E.  *No Prejudicial Cumulative Error*

Appellants assert that even if the alleged errors discussed above do not individually warrant reversal, their cumulative effect does.  We disagree.

"Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*Williams, supra*, 170 Cal.App.4th at p. 587, 646.)  "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' "  (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)  We found no actual error and any assumed error was harmless.  Thus, we reject appellants' claim of cumulative error.

## III. *THE TRIAL COURT DID NOT ERR WHEN IT DENIED SEVERANCE OF THE TWO MURDERS*

A.  *Legal Principles*

"[C]onsolidation or joinder of charged offenses 'is the course of action preferred by the law.' " (*People v. Soper* (2009) 45 Cal.4th 759, 772 (*Soper*).)  When separate accusatory pleadings assert offenses that are "connected together in their commission or [are] . . . of the same class of crimes or offenses, . . . the court may order them to be consolidated."  (§ 954.)  The purpose of section 954 is to avoid the " 'increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' " (*Soper*, at p. 772.)  We review the denial of a severance motion for an abuse of discretion, based on the facts before the court at the time of its ruling, which requires reversal only where it is reasonably probable that separate trials would have led to a more favorable result for defendant.  (*People v. Burney* (2009) 47 Cal.4th 203, 237 (*Burney*).)  A defendant seeking severance must make a stronger showing of prejudice

35

than required for exclusion of other crimes evidence in a severed trial. (*People v. Arias* (1996) 13 Cal.4th 92, 127.)

Where, as here, " 'the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion.' [Citation.] 'In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 388–389.)

B. *Analysis*

Appellants moved for separate trials of the 2011 and 2013 homicides arguing that the prosecution was bootstrapping the weaker 2011 murder with the stronger 2013 murder and trying the murders together would inflame the jury against them. Frank also argued that evidence of the circumstances surrounding the two murders were not cross-admissible. The trial court denied the motions, stating that it had presided over the preliminary hearing, understood that the two murders involved different evidence with different strengths, but that the evidence of the 2011 murder was not so weak that trying the two offenses together constituted "boot-strapping." The court also concluded that the evidence of each shooting would be cross-admissible in separate trials.

Appellants concede that the statutory requirements for joinder under section 954 were satisfied but assert that evidence of one homicide would not be cross-admissible in a separate trial of the second homicide. Appellants contend that the primary issue to be determined at trial was whether they committed the two murders.

The first step in assessing whether a combined trial was prejudicial is to determine whether evidence on the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the other charges. (*People v. Jenkins* (2000) 22 Cal.4th 900, 948.) In other words, the cross-admissibility of the evidence is sufficient to negate prejudice without any further showing. (*Ibid.*) However, the absence of cross-admissibility, by itself, is insufficient to demonstrate prejudice. (*People v. Memro* (1995) 11 Cal.4th 786, 850.)

Here, a substantial portion of the evidence from the two sets of charges would have been cross-admissible under Evidence Code section 1101, subdivision (b), as evidence of intent, common plan or scheme, and identity if the two murders had been tried separately. Both murders involved rival gang members, vehicles belonging to P. family members, and appellants working together. Additionally, the gang-related evidence would have been cross-admissible in separate trials of the two murders as relevant to the gang enhancements common to all charges.

Even assuming evidence of the incidents were not cross-admissible, the absence of this factor is not dispositive. (*Soper*, *supra*, 45 Cal.4th at pp. 774–775.) Section 954.1 explicitly states "evidence concerning one offense or offenses *need not be admissible* as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." (Italics added.) "In the [hypothetical] absence of cross-admissibility, we turn

to the remaining factors to assess whether the trial court abused its discretion." (*People v. Simon* (2016) 1 Cal.5th 98, 123–124 (*Simon*).)

Appellants do not argue the next factor—whether any of the charges were likely to inflame the jury against them. They tacitly concede, and we agree, that the factual circumstances for both murders may have been "different in their particulars," but were "equally abhorrent." (*People v. Price* (1991) 1 Cal.4th 324, 390.)

Appellants contend that the evidence connecting them to the 2011 homicide is far weaker than the evidence connecting them to the 2013 homicide so that the prejudicial spill-over effects of joining the two cases for trial outweighed the benefits of joinder. "The core prejudice concern arising in connection with this [factor] is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials." (*Simon*, *supra*, 1 Cal.5th at p. 127.) However, there is "no abuse of discretion if the evidence of guilt for each of the joint incidents is sufficiently compelling." (*Ibid.*)

Here, the trial court did not abuse its discretion by finding that the evidence of both murders was sufficiently compelling to try them jointly. (*Ante*, pt. II.B.) On this issue, the major difference between the two murders is that Darris's murder involved only circumstantial evidence whereas Xusha's murder involved eyewitness testimony. Nonetheless, it is "always . . . possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper*, *supra*, 45 Cal.4th at p. 781.) Moreover, severance is not required "because properly joined charges might make it more difficult for a defendant

to avoid conviction compared with his or her chances were the charges to be separately tried." (*Ibid.*) To demonstrate the potential for a prejudicial spillover effect, a defendant must show an "extreme disparity" in the strength or inflammatory character of the evidence. (*Belton v. Superior Court* (1993) 19 Cal.App.4th 1279, 1284.) The trial court reasonably concluded no significant risk existed of an unjustified conviction based on a possible spillover effect.[12]

Finally, none of the counts against either appellant was a capital charge. Here, of the four factors to be considered, none weigh clearly in favor of a prejudice finding. It was reasonable for the trial court to conclude that trying the two murder charges together would not be unduly prejudicial to appellants when balanced against the benefits to the state of joinder, which are "very substantial." (*Soper, supra,* 45 Cal.4th at p. 783.)

Appellants also suggest that joinder of the murder charges rendered their trial grossly unfair. We disagree.

If joinder was proper and there was no sufficient showing of prejudice at the time the trial court ruled, we " 'still must determine whether, in the end [and in light of the evidence as presented at trial], the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law.' " (*Soper, supra,* 45 Cal.4th at p. 783.) We will reverse a judgment for gross unfairness "only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Simon, supra,* 1 Cal.5th

---

12  Frank also argues that his jailhouse confession to the informant regarding the 2013 murder required severance of the 2013 murder from the 2011 murder because nothing remotely comparable was presented for the 2011 killing. This observation regarding the imbalance of the evidence between the 2011 and 2013 murders does not warrant severance of these properly joined charges because the relative strength of the evidence was sufficiently strong in both cases. (*Soper, supra,* 45 Cal.4th at p. 781.)

98, 129–130.) "Appellate courts have found ' "no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials." ' " (*Soper*, at p. 784.)

Here, the evidence establishing appellants' guilt for the 2011 murder and 2013 murder was distinct. Moreover, the court instructed the jury that each of the counts was a separate crime that must be separately decided. (CALCRIM No. 3515.) Nothing in the record indicates the jury failed to follow this instruction. (*People v. Merriman* (2014) 60 Cal.4th 1, 48–49 [absent contrary showing, jury presumed to follow instructions to consider each count separately].) We conclude that the trial court's order denying severance of the murder charges did not render appellants' trial grossly unfair so as to violate their due process rights.

## IV. *THE TRIAL COURT DID NOT ERR WHEN IT DENIED SEVERANCE OF APPELLANTS' TRIALS*

### A. *Additional Background*

Haddock moved to sever his trial from Frank's trial. At the hearing on the motion, the trial court had already denied appellants' motions to sever the two murder charges. The court noted that the prosecutor sought to introduce multiple statements by Frank implicating Haddock and depending on its rulings on the admissibility of those statements, the prosecutor might acquiesce to a two-jury trial. After the trial court ruled on the admissibility of Frank's statements, the prosecutor argued that separate juries were not required.[13]

---

13   Appellants do not challenge the court's rulings regarding the admissibility of those statements.

The trial court heard argument from counsel and denied the motions to sever and for a second jury. The court observed that trial would take between 12 and 16 weeks and "about 99 percent of the evidence is going to be admissible in a trial as to each of these individuals if they were tried separately or if they're tried together." Although some evidence existed that would be admissible only in a trial involving one of the defendants, the prosecutor stated that this evidence would not be introduced if the men were tried together. From a judicial economy standpoint, the trial court concluded that having separate juries did not make sense because all jurors were "going to hear the same thing and they're going to be making the decisions just as to the different individuals."

B. *Legal Principles*

Section 1098 provides in part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." Thus, "[o]ur Legislature has expressed a strong preference for joint trials." (*People v. Souza* (2012) 54 Cal.4th 90, 109 (*Souza*).) Typically, when defendants are " 'charged with the same crimes arising from the same events' " the court is presented with a "classic case for a joint trial." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 379 (*Bryant*).) The court's discretion to order severance of defendants is guided by certain nonexclusive factors, " 'such that severance may be appropriate "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." ' " (*Souza*, at p. 110.)

41

"Simply because the prosecution's case will be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair." (*Bryant*, *supra*, 60 Cal.4th at p. 379.) "Indeed, important concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against ensuing charges." (*Ibid*.) "We review the court's denial of severance for abuse of discretion based on the facts as of the time of the ruling. If the court properly denied severance at the time, the reviewing court may reverse a judgment only if it finds that the joint trial caused gross unfairness that denied due process." (*People v. Sánchez* (2016) 63 Cal.4th 411, 464 (*Sánchez*).)

C. *Analysis*

Haddock contends the presence of Frank's admissions, prior bad acts, and other evidence unique to Frank undermined his rights to due process and a fair trial. Specifically, he contends that Frank's confession through the jailhouse informant prejudiced him making it impossible for the jury to assess the evidence fairly. He argues that testimony from jailhouse snitches should be given greater scrutiny by trial and appellate courts because the perils of informant testimony cannot be minimized.

As a preliminary matter, Haddock does not challenge the admissibility of Frank's nontestimonial statements to the jailhouse informant. (*Davis v. Washington* (2006) 547 U.S. 813, 823–826 [the confrontation clause does not bar admission of hearsay statements that are not testimonial]; *People v. Nelson* (2010) 190 Cal.App.4th 1453, 1463 [same]; *People v. Fayed* (2020) 9 Cal.5th 147, 169 ["[S]tatements made unknowingly to an informant or statements between fellow prisoners are 'clearly nontestimonial.' "].) Nor does Haddock contend that Frank's statements to the informant fail to

42

qualify as declarations against penal interest. (*People v. Almeda* (2018) 19 Cal.App.5th 346, 363–368 [codefendant's nontestimonial jailhouse statements that included details police were able to corroborate were against declarant's own interest were not exculpatory, self-serving, or collateral, and inextricably linked both defendants to crime, and so were admissible against defendant].)

Instead, Haddock argues that his trial should have been severed from Frank's trial because Frank's statements to the jailhouse informant were suspect. Haddock, however, fails to explain how this fact mandated a separate trial or jury. Nor has Haddock cited any authority requiring a separate jury under similar circumstances. During cross-examination, Haddock's counsel made the jury aware of the jailhouse informant's criminal history and what the informant received from the government to relocate. Haddock's counsel reminded the jury during closing argument about the informant's background, the witness benefits he received, and multiple felony convictions, arguing that jurors should "be very skeptical about what [the informant] has to say and what he has to gain." The trial court also instructed the jury on how to evaluate the informant's credibility. (CALCRIM Nos. 316 [Additional Instructions on Witness Credibility—Other Conduct], 336 [In-Custody Informant], 358 [Evidence of Defendant's Statements].) Accordingly, Haddock has not convinced us that Frank's confession through the informant required a separate trial or jury.

Haddock next argues that Frank's prior bad acts and conduct inflamed the jury and created a risk that it would convict him based upon his criminal propensity and association with Frank rather than on a determination of his individual culpability for the crimes. We disagree.

"Prejudicial association might exist if 'the characteristics or culpability of one or more defendants [are] such that the jury will find the remaining

defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue.' " (*Sánchez, supra,* 63 Cal.4th at p. 464.) Nonetheless, "[i]ndividuals who choose to commit crimes together are not generally entitled to shield the true extent of their association by the expedient of demanding separate trials." (*Bryant, supra,* 60 Cal.4th at p. 383 [no improper guilt by association when evidence was clear as to each defendant's role in the criminal organization, and defendants had different roles].) "To justify severance the characteristics or culpability of one or more defendants must be such that the jury will find the remaining defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue." (*Ibid.*)

Here, the trial court acted within its discretion in denying severance. The jury learned of Frank's involvement in an uncharged drive-by shooting in March 2011 at the P. family home. They also learned of Haddock's involvement in an uncharged act identical to Frank's except for the date and intended target. In January 2013, Frank pleaded guilty to attempted murder for his act of driving a fellow gang member to a location where the other gang member shot a rival Skyline gang member in the chest. However, the jury also learned that in 2009 Haddock pleaded guilty to a very similar crime; namely, assault with means of force likely to produce great bodily injury for participating in a drive by shooting of a Skyline gang member with two other LPB gang members. Based on this record, it is unlikely that Frank's prior attempted murder conviction or uncharged act caused the jury to convict Haddock based solely on his association with Frank.

Moreover, the trial court limited the risk of prejudice by instructing the jury that it "must separately consider the evidence as it applies to each

44

defendant" and it "must decide each charge for each defendant separately." (CALCRIM No. 203.) "Jurors are expected to follow instructions in limiting evidence to its proper function[.]" (*Bryant*, *supra*, 60 Cal.4th at p. 381.)

Haddock next claims the jury could not impartially consider his defenses based on the joinder. "[T]o obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' [Citations.] Stated another way, ' "mutual antagonism" only exists where the acceptance of one party's defense will preclude the acquittal of the other.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 168.) Here, appellants' expected defenses were not technically "conflicting" in that both denied participating in the murders. Haddock has not explained how the jury could not impartially consider his defenses based on the joinder.

Finally, we reject Haddock's argument that the trial court's refusal to sever his trial from Frank's violated his rights to due process and a fair trial. An order denying severance may render an appellant's trial grossly unfair so as to violate his due process rights "only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Simon*, *supra*, 1 Cal.5th 98, 129–130.) Haddock, however, has not shown a reasonable probability that the joinder affected the jury's verdict. In sum, joinder of appellants did not result in gross unfairness amounting to a due process violation.

45

# V. *ANY INSTRUCTIONAL ERROR REGARDING THE CONSPIRACY TO COMMIT MURDER COUNTS WAS HARMLESS*

A. *Additional Background*

The trial court instructed the jury that murder required malice aforethought, explaining that malice aforethought may be express or implied. (CALCRIM No. 520.) Malice is express when the defendant intended to unlawfully kill a human being. (*Ibid.*) Malice is implied when (1) the defendant intentionally committed the act, (2) the natural and probable consequences of the act were dangerous to human life, (3) at the time the defendant acted, he knew his act was dangerous to human life, and (4) the defendant deliberately acted with conscious disregard for human life. (*Ibid.*)

The court then instructed the jury on first degree murder. (CALCRIM No. 521.) With respect Darris's murder, the instruction told the jury that there were two theories upon which it could convict appellants: (1) willful, deliberate, and premeditated murder or (2) lying in wait. (*Ibid.*) With respect to Xusha's murder, the instruction told the jury that there were three theories upon which it could convict appellants: (1) willful, deliberate, and premeditated murder, (2) lying in wait, or (3) shooting from a motor vehicle. (*Ibid.*) The court also instructed the jury that it could convict appellants of second degree murder for Xusha's murder if it found that the defendant discharged a firearm from a motor vehicle but only intended to inflict great bodily injury. (CALCRIM No. 525.)

The court also instructed on the intent required for an accomplice, informing the jury that if it found one of the defendants committed first degree murder but was not the actual killer, it must find that he acted with the intent to kill to return a true finding on the special circumstances. (CALCRIM No. 702.) For the special circumstance of lying in wait, the court

told the jury that the People must prove that the defendant "intentionally killed" Darris or Xusha and "intended to kill . . . by taking the person by surprise." (CALCRIM No. 728.)

Finally, regarding the crime of conspiracy to commit murder, the court instructed that the People were required to prove "that the members of the alleged conspiracy had an agreement and intent to commit murder." (CALCRIM No. 563.) This instruction also informed the jurors that "*[t]o decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit the crime of murder, please refer to instructions which define that crime*." (Italics added.)

With respect to the murder counts, the jury found appellants guilty of first degree murder and returned a true finding on the lying in wait special circumstance for Darris's murder and the discharge from a motor vehicle special circumstance for Xusha's murder, specifically finding that appellants acted "with the intent to kill" for both murders.

B. *Analysis*

A conviction for conspiracy to commit murder requires a finding of intent to kill. Accordingly, this crime cannot be based on a theory of implied malice which does not require a finding of intent to kill. (*People v. Swain* (1996) 12 Cal.4th 593, 607 (*Swain*).) *Swain* involved two defendants who were convicted of conspiracy to commit murder and *second* degree murder. (*Id.* at p. 598.) The Supreme Court concluded that the trial court improperly instructed the jury on an implied malice theory of conspiracy to commit murder. (*Id.* at pp. 599, 602, 607.) It found the error prejudicial because the jury "returned general verdicts, which do not inform us on what theory they found the requisite element of malice necessary to convict on the charges of conspiracy to commit murder. Under the implied malice instructions, the

47

jury could have found malice without finding intent to kill. [Citation.] The prosecutor repeatedly referred to implied malice in the closing arguments, stating at one point that '. . . this could very easily be an implied malice case.' " (*Id.* at p. 607.) Accordingly, the *Swain* court reversed the defendants' convictions of conspiracy to commit murder. (*Ibid.*)

To avoid this error, the Bench Notes to CALCRIM No. 563 advise: "Do not cross-reference the murder instructions unless they have been modified to delete references to implied malice. Otherwise, a reference to implied malice could confuse jurors, because conspiracy to commit murder may not be based on a theory of implied malice." (Bench Note to CALCRIM No. 563 (2020 ed.), Vol. 1, p. 339.)

Appellants contend that their convictions for conspiracy to commit murder must be reversed due to prejudicial instructional error that allowed the jury to find them guilty of conspiracy to commit murder based on implied malice rather than an intent to kill. The People disagree. They assert that when read together, the instructions made it clear to the jury that a conspiracy to commit murder conviction required the intent to kill. Even assuming the jury could have interpreted the instructions in the manner appellants suggest, the People claim any error was harmless beyond a reasonable doubt based on the verdicts convicting appellants of first degree murder and the true findings on the special circumstance allegations.

Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury. (*People v. Wilson* (1992) 3 Cal.4th 926, 943.)[14]  Here, CALCRIM No. 563 stated that to prove conspiracy

---

[14]  Although appellants did not object to CALCRIM No. 563 as given, "[i]nstructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

to commit murder, the People had to prove that the defendant "intended to agree and did agree with one or more other people to intentionally and unlawfully kill," and that the members of the alleged conspiracy "had an agreement and intent to commit murder." The instruction also stated: "To decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit murder, please refer to the instructions which define that crime." The murder instructions, however, were not modified to delete references to implied malice as they relate to the charge of conspiracy as suggested by the bench notes to CALCRIM No. 563. As our high court recently noted, CALCRIM No. 563 and the corresponding murder instructions "would avoid any possibility of confusion if they told the jury that when it refers to the instructions that define murder, it should not consider any instructions regarding implied malice because conspiracy to commit murder may not be based on a theory of implied malice. Conspiracy to commit murder may be based only on express malice, i.e., an intent to kill." (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 642.) "Alternatively, because 'all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder' [citation], references to 'conspiracy to commit murder' and 'intent to commit murder' in the standard conspiracy instructions could be changed along the following lines. The instructions should make clear that what is required is a conspiracy to commit first degree murder and an intent to commit first degree murder, respectively. That would also avoid any confusion about the nature of the intent required for this type of conspiracy." (*Ibid.*)

Here, the instructions given did not conform to our Supreme Court's suggestion in *People v. Beck and Cruz*, *supra*, 8 Cal.5th 548 that it be made clear that "what is required is a conspiracy to commit first degree murder."

(*Id.* at p. 642.) We review instructional errors such as the one alleged here under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). The question is whether it can be "determined beyond a reasonable doubt that the erroneous implied malice murder instructions . . . contribute[d] to the conviction[ ] on the conspiracy count[ ]." (*Swain, supra*, 12 Cal.4th at p. 607.) Based on the record, we conclude the error was harmless beyond a reasonable doubt.

For both murders, the jury found appellants guilty of first degree murder and found true the allegation that the perpetrator "intentionally killed the victim by means of lying in wait." For Xusha's murder, the jury also found true the allegation that the defendant or a perpetrator "intentionally killed the victim by means of discharging a firearm from a motor vehicle." Thus, unlike *Swain, supra*, 12 Cal.4th 593, the verdicts here "inform us on what theory [the jury] found the requisite element of malice necessary to convict on the charges of conspiracy to commit murder." (*Id.* at p. 607; *People v. Beck and Cruz, supra*, 8 Cal.5th at p. 643 [instructional error harmless where jury found defendants guilty of first degree premeditated murders of all victims].) Accordingly, no reasonable possibility exists that the jury convicted appellants of conspiracy to commit murder without first finding an intent to kill. Thus, the instructional error was harmless beyond a reasonable doubt.

## VI. *APPELLANTS' CHALLENGE TO THE IMPOSITION OF FINES AND FEES*

At appellants' sentencing hearing on October 11, 2019, the trial court ordered them to pay a court facilities fee of $150 (Gov. Code, § 70373; $30 for each of five counts), a court operations assessment or security fee of $200 (§ 1465.8; $40 for each of five counts), a criminal justice fee of $154 (Gov. Code, § 29550), and a restitution fine of $10,000 (§ 1202.4, subd. (b)). Defense

counsel did not object to the imposition of these sums or request a hearing on their client's respective ability to pay them, and the trial court made no inquiry into and no finding regarding appellants' ability to pay any of the assessments, fines, or penalty assessments.

Citing *Dueñas, supra,* 30 Cal.App.5th 1157, decided on January 9, 2019, approximately nine months before their sentencing hearing, appellants argue that the trial court violated their right to due process by imposing various fines and fees without first finding that they had the ability to pay them.[15] Appellants alternately assert that imposition of the sums ordered constitutes excessive punitive sanctions under the Eighth Amendment. Haddock contends that his counsel's failure to argue these issues should be reviewed through the lens of ineffective assistance of counsel to prevent forfeiture.

Even before *Dueñas, supra,* 30 Cal.App.5th 1157, appellants had a statutory right to object to the $10,000 maximum restitution fine on the basis that they lacked the ability to pay. (§ 1202.4, subd. (c); *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*).) Moreover, as to the restitution fine, section 1202.4 expressly allows consideration of a defendant's ability to pay when determining whether to increase the restitution fine above the statutory minimum of $300. (§ 1202.4, subd. (c).) Thus, appellants could have objected to their $10,000 restitution fine based on an inability to pay but failed to do so. Notably, appellants were aware *before sentencing* that the probation department recommended imposing the $10,000 maximum restitution fine. Their failure to object to the restitution fine forfeits this

---

[15]    The validity of *Dueñas,* is unsettled and will be decided by our Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.) Accordingly, it is unnecessary for us to comment on the merits of the analysis employed in *Dueñas*.

claim of error on appeal. (*Gutierrez*, at p. 1033 ["[E]ven if *Dueñas* was unforeseeable (a point on which we offer no opinion), under the facts of this case [defendant] forfeited any ability-to-pay argument regarding the restitution fine [above the statutory minimum] by failing to object."].)

Appellants were in the best position to know their respective ability to pay, so it was incumbent on them to raise the issue if they could not pay the restitution fine. (*People v. Avila* (2009) 46 Cal.4th 680, 729.) Because appellants did not raise any issue concerning their ability to pay a $10,000 restitution fine, we conclude they have also forfeited their challenge to the much smaller fees and assessments. (*Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033 [defendant's failure to challenge a restitution fine greater than minimum on grounds of inability to pay forfeited defendant's objection to fees on same grounds]; accord, *People v. Smith* (2020) 46 Cal.App.5th 375, 395.)

Appellants' alternative Eighth Amendment challenge is similarly forfeited based on their silence regarding their ability to pay in the trial court. Although the United States Supreme Court recently held that the excessive fines clause of the federal Constitution is "an incorporated protection applicable to the States" (*Timbs v. Indiana* (2019) 586 U.S. __, 139 S.Ct. 682, 685), California courts have entertained challenges to fines under article 1, section 17 of the state Constitution (see, e.g., *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728; *People v. Urbano* (2005) 128 Cal.App.4th 396, 406). Accordingly, appellants were required to raise their excessive fines objection in the trial court to preserve this claim. (See *People v. McCullough* (2013) 56 Cal.4th 589, 592–593 [constitutional challenge to booking fee forfeited]; *People v. Torres* (2019) 39 Cal.App.5th 849, 860 & fn. 4 [excessive fines claim forfeited in absence of timely objection].)

In any event, even putting forfeiture aside, we would affirm the trial court's judgments because any error in the trial court's failure to consider, sua sponte, appellants' ability to pay the fines and assessments is harmless on this record. (See *People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140 (*Johnson*); *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.)

At the time of sentencing, Haddock was 28 years old. He had a college degree and told the probation officer that he earned $2,000 to $3,000 per month buying and reselling cars, paid $1,300 in rent, and had no money in the bank or credit card debit. Haddock denied any medical or psychological problems and his counsel represented at the sentencing hearing that Haddock played football while in college. Haddock's situation is different from the appellant in *Dueñas*, *supra*, 30 Cal.App.5th 1157, who was unable to work due to a disability. (*Id*. at p. 1160.)

Frank was also 28 years old at the time of sentencing. Frank, however, declined to be interviewed for the probation report. Nonetheless, his criminal history, which dated back to 2011, suggests a certain amount of vigor and hence the ability to earn prison wages. Haddock will similarly be able to earn money while in prison to pay the fines and fees. (*People v. Jenkins* (2019) 40 Cal.App.5th 30, 41 ["[I]t is entirely appropriate to consider the wages defendant may earn in prison on the inability-to-pay issue."]; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 [defendant did not show inability to pay $10,000 restitution fine simply because prison wages would make it difficult, it would take a long time, and the fine might never be paid].)

Appellants could also make payments on the amounts owed out of monetary gifts from family and friends during their prison sentences. (See, e.g., *People v. Lewis* (2009) 46 Cal.4th 1255, 1321.) Moreover, the trial court was "permitted to conclude that the monetary burden the restitution fine

53

[and other sums] imposed on [appellants] was outweighed by other considerations," such as the seriousness and gravity of the offense, and the circumstances of its commission. (*People v. Potts* (2019) 6 Cal.5th 1012, 1056–1057; § 1202.4, subd. (d).)

Even assuming, for the sake of argument, that appellants suffered a constitutional violation when the court imposed this financial burden on then without considering their ability to pay, we conclude on this record that the assumed error was harmless beyond a reasonable doubt.[16] (*Chapman*, *supra*, 386 U.S. at p. 24; *Johnson*, *supra*, 35 Cal.App.5th 134, 139–140.)

## VII. *ANY UNPAID PORTION OF THE CRIMINAL JUSTICE ADMINISTRATION FEE SHALL BE VACATED*

After completion of briefing in this matter on June 30, 2021, the Legislature enacted Assembly Bill No. 1869 (Assem. Bill 1869), effective July 1, 2021, repealing the provision under which the trial court ordered appellants to pay a $154 criminal justice administration fee (the fee). (Stats. 2020, ch. 92, § 22 [deleting Gov. Code, § 29550, former subdivision (c)].)[17] This bill also added section 6111 to the Government Code, effective July 1, 2021. (Stats. 2020, ch. 92, § 11.) Government Code section 6111, subdivision

---

[16]  Given this holding, we need not address Haddock's argument that his counsel rendered ineffective assistance by failing to raise a *Dueñas* objection.

[17]  In enacting Assem. Bill 1869, the Legislature sought "to eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and to eliminate all outstanding debt incurred as a result of the imposition of administrative fees." (Stats. 2020, ch. 92, § 2.) The bill "abrogated the authority to impose and collect 23 different administrative fees, including as relevant here, . . . the criminal justice administration fee." (*People v. Greeley* (2021) 70 Cal.App.5th 609, 625.)

(a) states:  "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to  Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and  29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."

We permitted all parties to file supplemental briefs regarding the application of Assem. Bill 1869 to these appeals.  In response, both sides agreed that any unpaid balance of the fee automatically became unenforceable and uncollectible beginning on July 1, 2021, and must be vacated from the judgment.  We agree that the plain language of the newly-enacted statute mandates this result. (*People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953 (*Lopez-Vinck*) [holding that "by its express terms, [Government Code] section 6111 envisions that the referenced costs are to be vacated, and it makes the vacatur mandatory through its use of the word 'shall' "].)  As we explained in *Lopez-Vinck*, "Because [Government Code] section 6111 indicates a legislative intent to extend the ameliorative changes in the law regarding the imposition of administrative fees to individuals serving both final and nonfinal sentences, but only to the extent of relieving those individuals of *the burden of any debt that remains unpaid* on and after July 1, 2021, the [*In re*] *Estrada* [(1965) 63 Cal.2d 740] rule does not apply, and [a defendant] is not entitled to have the fee imposed pursuant to Government Code section 29550.1 vacated in its entirety as a result of the repeal of section 29550.1."  (*Lopez-Vinck*,  at p. 953, italics added.)

Thus, we reject Frank's request that his abstract of judgment be amended to "direct that any portion of the booking fee that was collected after July 1, 2021, be returned to [his] books," and that the superior court be directed to enter such an order because the changes made by Assem. Bill

55

1869 do not apply retroactively to payments made prior to the effective date of the new statutes.  (*Lopez-Vinck, supra*, 68 Cal.App.5th at p. 953.)  Rather, appellants are "entitled to the vacatur of that portion of the criminal justice administration fee imposed pursuant to Government Code section 29550.1 that remains unpaid as of July 1, 2021, and to the modification of [their] judgment[s] consistent with such vacatur."  (*Ibid.*)

## VIII. *NO REVERSIBLE ERROR DURING IN CAMERA REVIEW*

"The defendant generally is entitled to discovery of information that will assist in his defense or be useful for impeachment or cross-examination of adverse witnesses.  [Citation.]  A motion for discovery must describe the information sought with some specificity and provide a plausible justification for disclosure.  [Citation.]  The court's ruling on a discovery motion is subject to review for abuse of discretion."  (*People v. Jenkins, supra,* 22 Cal.4th at p. 953.)  When the state seeks to protect items from disclosure a "court must examine them in camera to determine whether they are 'material' to guilt or innocence."  (*People v. Webb* (1993) 6 Cal.4th 494, 518 (*Webb*).)

The trial court held multiple in camera hearings in this case.  Haddock requests that we conduct an in camera review of seven of these hearings to determine if the trial court erroneously withheld any responsive materials.  The People do not object to this request.  The People anticipate that examination of the transcripts and documents will show that the trial court properly exercised its discretion.  Should we conclude that some material should have been disclosed, the People assert that the appropriate remedy is to remand the matter to the trial court to determine whether Haddock was prejudiced by the nondisclosure.

The transcripts of the trial court's confidential in camera hearings were transmitted to this court under seal.  On our own motion, by order dated

March 17, 2022, we augmented the record to include the sealed documents reviewed by the trial court at four of the hearings at issue, as follows: October 17, 2017 (redacted and unredacted copies of the police report); April 19, 2018 (redacted and redacted copies of preliminary hearing transcripts)[18]; September 25, 2018 (documents taken from Frank's cell); and June 3, 2019 (SDT Records from the San Diego Sheriff's Department). We independently reviewed these materials, and the transcripts of the seven in camera hearings at issue, to determine whether the trial court erroneously withheld any discoverable material. We briefly summarize the nature of each hearing and the material denied to the defense.

At an in camera hearing held pursuant to Evidence Code section 1040 on October 17, 2017, the trial court denied the defense access to portions of a police report by a detective regarding an active investigation. The police report contained witness statements from a P. family member. We reviewed the redacted and unredacted portions of the police report and find no error.

On April 19, 2018, in open court, the court heard argument on a defense motion to set aside a protective order that limited appellants' access to physical copies of discovery materials. The court inquired about giving appellants access to the preliminary hearing transcripts. After hearing argument from the prosecutor, the court expressed concern regarding witness intimidation and witness safety. The court then went in camera with the prosecutor to hear about the ongoing investigation. The court ordered the transcript of the in camera hearing to be sealed.

---

[18]  The clerk of the superior court filed a declaration stating that unredacted copies of the preliminary hearing transcripts were provided in the certified record on appeal.

When the court went back on the record, it denied the defense motion to set aside the protective order but modified the protective order to allow appellants to have copies of the preliminary hearing transcripts. The transcripts given to each appellant would bear a unique "watermark" to trace the origin of any transcripts improperly made public. Appellants subsequently signed a modified protective order giving them access to the preliminary hearing transcripts.

This modified protective order is not at issue in this appeal. Rather, Haddock asked that we review the in camera hearing ordered sealed by the court. We have reviewed the transcript of the in camera hearing and conclude that the trial court did not err in ordering the transcript to be sealed.

On September 25, 2018, the court held an in camera hearing with Haddock's defense counsel to review documents taken from Frank's jail cell. After defense counsel reviewed the materials, the trial court ordered the materials sealed without objection by defense counsel. The trial court did not err in sealing these materials.

At an in camera hearing on June 3, 2019, of "SDT Records from San Diego Sheriff Department" the trial court described its review of medical records subpoenaed by defense counsel pertaining to Marcel, a cooperating witness. After conducting an in camera review of these materials, the court released some documents to counsel. We discern no error.

At an in camera hearing on June 18, 2019, the trial court discussed an ongoing police investigation and a potential witness with the prosecutor. The trial court did not err in sealing the reporter's transcript of this hearing.

At an in camera hearing on June 20, 2019, with all counsel present, the trial court discussed with counsel a tip that Brittney P. provided to police,

unrelated to the case, where she received two $700 payments. After discussing possible collateral relevancy with defense counsel, the trial court excused defense counsel and discussed the matter further with the prosecutor. The trial court did not err in withholding the details of Brittney's cooperation.

During a chambers conference with the prosecutor on June 25, 2019, a discussion was held regarding an ongoing criminal investigation pertaining to a potential prosecution witness. The People disclosed to defense counsel felony offenses involving this potential witness. The potential witness never testified. The trial court properly ordered the discussion of this ongoing investigation sealed.

In summary, after independent review of the sealed materials, we conclude that the trial court did not abuse its discretion in denying the defense access to the withheld materials.

## IX. *REMAND IS REQUIRED TO DETERMINE HADDOCK'S CUSTODY CREDITS*

The sentencing court must grant a defendant actual time credits for both the day of arrest and the day of sentencing. (§ 2900.5; *People v. Browning* (1991) 233 Cal.App.3d 1410, 1412.) "[C]redit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted." (§ 2900.5, subd. (b).) "[I]t is the business of the trial court, and not the appellate court, to determine the credit to which the defendant is entitled by reason of pre-sentence confinement." (*People v. Montalvo* (1982) 128 Cal.App.3d 57, 62 (*Montalvo*).) An erroneous award of presentence custody credits is a jurisdictional error that may be corrected at any time. (*People v. Chilelli* (2014) 225 Cal.App.4th 581, 591.)

Haddock contends that the trial court miscalculated his pre-sentence custody credits based on his arrest date of July 20, 2016, and his sentencing date of October 11, 2019. He asserts that the abstract of judgment should be corrected to award him an additional 86 days of custody credit.

The People concede the error if Haddock was arrested on July 20, 2016. The probation report, however, set Haddock's confinement date as October 14, 2016. Even assuming Haddock was arrested on July 20, 2016, the People claim it is unclear if Haddock's time in custody was attributable to the proceedings in this case. Thus, the People assert that the matter should be remanded to the trial court to clarify the discrepancy on the record, determine Haddock's period of custody attributable to this case, and calculate his custody credits accordingly. We agree.

The record is unclear regarding Haddock's initial custody date and whether his custody date is attributable to the proceedings in the instant case. Therefore, the matter is remanded to the trial court to determine Haddock's period of custody attributable to the instant proceedings and to calculate his custody credits accordingly. (*Montalvo*, *supra*, 128 Cal.App.3d at p. 62 ["If the court does not have enough facts at the time of sentencing, its duty is to direct 'the sheriff, probation officer or other appropriate person' to produce the information."].)

## X. *HADDOCK'S PAROLE REVOCATION RESTITUTION FINE MUST BE STRICKEN*

The trial court sentenced Haddock to two consecutive life terms without the possibility of parole for the two murders. Additionally, Haddock did not receive any unstayed determinate prison terms that included a period of parole. (§ 3000, subd. (a)(1); *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 [upholding imposition of a section 1202.45 parole revocation restitution

fine where defendant was sentenced to death and to determinate prison terms under section 1170].) At sentencing, the trial court ordered Haddock to pay a $10,000 restitution fine pursuant to section 1202.45. Section 1202.45, subdivision (a), provides that the court "shall" assess an additional parole revocation restitution fine "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole."

Haddock contends the parole revocation restitution fine is unauthorized and should be stricken because it does not apply where the sentence includes life without parole. The People concede and we agree that the trial court erred by imposing a $10,000 parole revocation restitution fine under section 1202.45 because the court sentenced Haddock to life in prison without possibility of parole. Such a "fine may not be imposed for a term of life in prison without possibility of parole, as the statute is expressly inapplicable where there is no period of parole." (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.) Because the parole revocation restitution fine is unauthorized, Haddock's failure to raise this issue in the trial does not preclude relief. (*People v. Scott* (1994) 9 Cal.4th 331, 354.) Accordingly, we strike the parole revocation restitution fine.

## XI. *Assem. Bill 333*

### A. *Assem. Bill 333 Amendments to Section 186.22*

Effective January 1, 2022, Assem. Bill 333 "amends section 186.22 to require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343 (*Lopez*).) When appellants were tried, former section 186.22 defined a " 'criminal street gang' " as "any ongoing organization, association, or group of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former §186.22, subd. (f), italics added.)

Assem. Bill 333 narrowed the definition to "an ongoing, organized association or group of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.) This change requires that the People "prove that two or more gang members committed each predicate offense." (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1072; accord, *Lopez*, at pp. 344–345.)

Under the former version of section 186.22, the phrase "pattern of criminal gang activity" was defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of . . . two or more of [specified] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, by two or more *persons*." (Former § 186.22, subd. (e), italics added.)

Assem. Bill 333 changed this definition. Now, the predicate offenses must have been committed by two or more "members" of the gang (as opposed to any persons) and must have "*commonly* benefited a criminal street gang" and "the common benefit of the offense [must be] more than reputational. (§ 186.22, subd. (e)(1), italics added.) Additionally, at least one of these predicate offenses must occur after the effective date of this chapter, and the last of those offenses must have occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed. (*Id.* at subd. (e)(1).) Finally, the currently charged offense no longer counts as a predicate offense. (*Id.* at subd. (e)(2).) The new law also reduced the number of qualifying offenses that can be used to establish a pattern of criminal gang activity, removing vandalism, looting and several fraud-related offenses from the list. (*Id.* at subd. (e)(1)(A)-(Z).)

Assem. Bill 333 also requires the prosecution to prove the benefit the gang derives from the predicate and current offenses is "more than reputational." (Stats. 2021, ch. 699, § 3 [enacting § 186.22, subd. (g)].) "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Id*. at subd. (g).) Finally, Assem. Bill 333 added section 1109 requiring that gang enhancements charged under section 186.22, subdivision (b) or (d) be tried separately from the underlying charges upon request from the defense. (Stats. 2021, ch. 699, § 5.) The defendant's guilt on the underlying offense must first be determined, and a trial on the gang enhancement is held if the defendant is first found guilty of the underlying offense. (§ 1109, subd. (a)(1) & (2).) Additionally, a charge for active participation in a criminal street gang (street terrorism, § 186.22, subd. (a)), must be tried separately from "all other counts that do not otherwise require gang evidence as an element of the crime." (§ 1109, subd. (b).)

B. *Failure to Bifurcate the Gang Enhancements was Harmless*

Haddock asserts that new section 1109 requires that the judgment against him be reversed. He contends that all of Assem. Bill 333, including section 1109, should apply retroactively. He reasons that section 1109 is remedial in nature because it changes the procedure for the trial of a gang enhancement and changes proof of the gang enhancement to remedy a procedure that the Legislature viewed as problematic if not inherently unfair. The People contend section 1109, unlike other provisions of Assem. Bill 333,

63

does not apply retroactively because it is a change in trial procedure which applies prospectively.[19]

We need not decide whether section 1109 applies retroactively to nonfinal decisions because, even assuming error in trying the gang enhancements together with the substantive offenses, any such error was harmless whether considered under the standard of *Watson* or *Chapman*. (*Watson*, *supra*, 46 Cal.2d at p. 836 [state law error requires reversal only if it is reasonably probable that the error had an effect on the verdict]; *Chapman*, *supra*, 386 U.S. at p. 24 [reversal is required under the federal Constitution unless the error was harmless beyond a reasonable doubt]; see *People v. E.H.* (2022) 75 Cal.App.5th 467, 480) [concluding the failure to bifurcate was harmless under *Watson* because verdict was not based on improper bias but on strong evidence defendant committed the charged offenses]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1133; [defendant not entitled to reversal of his conviction under *Watson* because he was not harmed by the failure to bifurcate gang enhancement].)

The prosecution presented persuasive evidence of appellants' involvement in both murders. As we previously discussed regarding Darris's murder, the People presented evidence and argued that Glenn ordered a hit on one of the P. brothers within 48 hours and that Frank was to recruit individuals to help. On the evening of Darris's murder, Frank and Haddock were involved in a gang-related fight where Haddock had a gun. Cell phone location data showed that Frank called Haddock before this fight and that

---

19    Haddock also argues that this record contains a reasonable inference that had bifurcation of the gang allegations been an available option, his counsel would have so requested. The People do not challenge this assertion and we need not address it.

Haddock was in communication with Glenn. Thereafter, Frank communicated with a girl throughout the evening and learned that Skyline gang members were on a party bus with the girl. Frank told the girl that he had gotten into a fight at a different party bus and would meet her when the party bus returned the girl back to a restaurant. Darris's shooting occurred in the restaurant parking lot shortly before 2:00 a.m. Despite almost constant use during the evening, appellants' cell phones were not connected to the network at the time of Darris's shooting. Less than 15 minutes after the shooting, Haddock had a text message and social media transaction with Glenn. Darris was shot while sitting in a car owned by one of the P. brothers. "5-0" or "5-9" had been written in dust or condensation on the car window, which meant to Malcolm that the LPB gang was involved in the shooting.

The jury heard testimony that appellants were together on the evening of Xusha's murder when they learned that Malcolm and other Skyline gang members were down the street at a hookah lounge. Haddock saw cars leaving the hookah lounge and followed the caravan of vehicles. Either Frank or Haddock recognized Malcolm in one of the cars. After Haddock positioned his vehicle, Frank began shooting at the car driven by Malcolm, injuring Malcolm and killing Xusha with a shot to his head. A jailhouse informant testified that Frank described how he shot at another car on a freeway and told the informant that he knew the person he shot had been killed because he saw the person's head bounce backward. Police later found gunshot residue in Haddock's car, which Haddock was trying to sell. Haddock's girlfriend told law enforcement that she was continuously with Haddock starting at 1:00 a.m. on the day of Xusha's murder but their messages to each other indicated that they were not together.

65

In arguing that the failure to bifurcate the gang enhancements from the substantive crimes was prejudicial, Haddock ignores that courts routinely admit gang evidence "when the very reason for the crime, usually murder, is gang related." (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.) Specifically, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) This was the case here. (See, *ante*, pt. II.)

Other than the stipulated admission of the predicate acts and the gang expert's testimony regarding the principal activities of LPB, the evidence of gang membership and the gang rivalry between LPB and Skyline would have been admissible on the substantive crimes alleged against appellants even if no gang enhancements had been alleged. Stated differently, the gang evidence presented here was relevant because it had "a 'tendency in reason to prove or disprove any disputed fact that is of consequence' to resolving the case." (*Bryant*, *supra*, 60 Cal.4th at p. 405; Evid. Code, § 351 ["Except as otherwise provided by statute, all relevant evidence is admissible."]; Evid. Code, § 210.) Haddock contends that the gang evidence admitted into evidence constituted "prejudicial overkill." Unlike *People v. Albarran* (2007) 149 Cal.App.4th 214, cited by Haddock, the evidence here does not come close to the irrelevant "overkill" evidence admitted in *Albarran*. (*Id.* at p. 228 ["[e]vidence of threats to kill police officers, descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia had

66

little or no bearing on any other material issue relating to [defendant's] guilt on the charged crimes" and "was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of [defendant's] actual guilt."].)

Moreover, the trial court instructed the jury with CALCRIM No. 1403 to consider "evidence of gang activity only for the limited purpose of deciding whether . . . [¶] [t]he defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related . . . allegations charged;" . . . and not to "conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." We presume that the jurors followed the trial court's instructions in the absence of any evidence to the contrary. (*Krebs*, *supra*, 8 Cal.5th at p. 335.) There is no evidence suggesting the jurors were unable or unwilling to follow the court's instruction.

On this record, we conclude that appellants have failed to demonstrate they would have achieved a more favorable outcome at trial on the substantive charges against them had the gang enhancements been tried separately.[20]

---

[20] In *People v. Burgos* (2022) 77 Cal.App.5th 550 a divided appellate court held that section 1109 applies retroactively. (*Id.* at p. 568.) The *Burgos* majority also concluded that the failure to bifurcate the gang enhancements in that case "likely" constituted " 'structural error' because it 'def[ies] analysis by harmless-error standards.' " (*Ibid.*) On the instant record, we cannot conclude that the failure to bifurcate amounted to structural error. As we already explained, the gang evidence was highly relevant to the charges against appellants and the admission of the stipulated evidence pertaining to the predicate offenses and principal activities of LPB was harmless under any standard of review. Thus, we disagree with the concern voiced by the *Burgos* majority that it can be "difficult to determine how the outcome of the trial would have been affected if [the proceeding] had been bifurcated to try

C. *The True Findings on the Gang Enhancement Allegations Must be Vacated*

Appellants argue, and the People concede, that the balance of the amendments to section 186.22 apply retroactively to appellants. We agree and accept the concession. (*Lopez, supra*, 73 Cal.App.5th at p. 344.)

The trial court instructed the jury that if it found appellants guilty of the charged offenses, it must then decide for each crime if the People proved the additional allegation that appellants "committed or attempted to commit the crime for the benefit of, at the direction of, or in association with a criminal street gang" and "intended to assist, further, or promote criminal conduct by gang members." (CALCRIM No. 1401.) The jury subsequently found true the gang enhancement allegation for appellants attached to each count. (§ 186.22, subd. (b)(1) & (5).)

Amended subdivision (g) of section 186.22 defines the term "to benefit, promote, further, or assist" as meaning "to provide a common benefit to members of a gang where the common benefit is more than reputational." A nonreputational common benefit might consist of "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Ibid.*)

Appellants assert that the true findings on the gang allegations for all counts must be reversed because the jury was not instructed on the new requirement that the benefit to the gang must be more than reputational. The People concede that the gang expert testified that the individual members of LPB and the gang itself enjoyed reputational benefits from

---

the gang enhancements separately" because bifurcation in this case would not have drastically changed the nature of the instant proceeding. (*Ibid.*)

68

committing the predicate offenses. However, the People note that the gang expert also testified about nonreputational benefits to the gang such as generating revenue. The People also claim that the parties' stipulation and overwhelming evidence established that the offenses commonly benefitted LPB, and that the common benefit from the offenses was retaliation. Thus, they assert that any instructional error was harmless beyond a reasonable doubt.

Appellants have a constitutional right to a jury trial on "every essential element" of the crimes and enhancements charged against them "no matter how compelling the evidence may be against [them]." (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 71.) "By requiring proof for a gang enhancement that the benefit to the gang was more than reputational, [Assem. Bill 333] essentially adds a new element to the enhancement. When jury instructions are deficient for omitting an element of an offense, they implicate the defendant's federal constitutional rights, and we review for harmless error under the strict standard of *Chapman*. . . ." (*People v. Sek* (2022) 74 Cal.App.5th 657, 668 (*Sek*); *People v. E.H., supra,* 75 Cal.App.5th at p. 479 [same].) "Under the *Chapman* standard, reversal is required unless 'it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict.' " (*Sek,* at p. 668.)

We cannot conclude that the jury instruction was harmless beyond a reasonable doubt. The gang expert testified that a crime could benefit a criminal street gang by providing a reputational benefit to the gang and by generating revenue. Additionally, the People argued and the evidence established that some of the crimes were committed for retaliation. "[T]o prove harmless error under the *Chapman* standard, it is not enough to show that substantial or strong evidence existed to support a conviction under the

correct instructions.  [Citation.]  [¶]  The inquiry 'is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' " (*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 479.)

As in *Sek*, *supra*, 74 Cal.App.5th 657 and *People v. E.H.*, *supra*, 75 Cal.App.5th 467, " 'we cannot rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true.' " (*People v. E.H.*, at p. 480, citing *Sek* at p. 669.)  Accordingly, the instructional error was not harmless under the *Chapman* standard.[21]  The appropriate remedy is to reverse the true findings on the gang allegations attached to all counts and remand the matter with directions that the trial court either:  (1) conduct a new trial on any subsequent allegations filed by the People under current section 186.22 and a resentencing hearing based on any findings made thereon; or (2) if the People elect to not file any subsequent allegations under current section 186.22, conduct a resentencing hearing based on the omission of the gang allegations.  (See *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1033; *Sek*, *supra*, 74 Cal.App.5th at pp. 669–670; *Lopez*, *supra*, 73 Cal.App.5th at p. 346.)[22]

---

[21]  We also note that the gang allegation jury instruction, CALCRIM No. 1401, instructed the jury that "[t]he crimes, if any, that establish a pattern of criminal gang activity, *need not be gang-related*."  (Italics added.)  However, Assem. Bill 333 changed this and the law now requires that "the [predicate] offenses [to] commonly benefit[] a criminal street gang. . . ."  (§ 186.22, subd. (e)(1).)

[22]  Based on this result, we need not address appellants' alternative argument that the true findings on the gang enhancement allegations attached to counts 3, 4, and 5 (connected to Xusha's 2013 murder) must be reversed because there is only one predicate act that meets the narrower time

D. *The True Findings on the Gang-Related Firearm Enhancement Allegations Must be Reversed*

Section 12022.53 provides for sentence enhancements for using firearms in the commission of an enumerated felony. As explained in *Lopez, supra*, 73 Cal.App.5th 327, penalties may also be imposed under certain gang-related circumstances as follows: "First, the person who is a principal must be 'convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members' as set forth in section 186.22, subdivision (b). (See § 12022.53, subd. (e)(1)(A).) Second, '[a]ny principal in the offense' must have 'committed any act specified in subdivision (b), (c), or (d),' that is, any principal involved in the offense must have personally used a firearm in the escalating use categories provided in section 12022.53, subdivisions (b) through (d). (§ 12022.53, subd. (e)(1)(B).)" (*Lopez*, at p. 374.)

The jury found true the allegations that appellants were principals as to each count and in the commission of each offense at least one principal personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (e)(1). As the People concede, because the enhancements under section 12022.53, subdivision (e)(1) depend on a true finding under section 186.22, subdivision (b) (§ 12022.53, subd. (e)(1)(A)), the changes to section 186.22 made by Assem. Bill 333 require that the true

---

frames and that was committed "collectively." We also need not address appellants' argument that the fact their counsel stipulated to some of the gang evidence does not preclude application of Assem. Bill 333 benefits.

findings on these gang-related firearm enhancements must also be vacated and the matter remanded to the trial court to allow the People the option to retry these allegations.

As to Frank, the jury also found true a personal discharge causing death or great bodily injury allegation under section 12022.53, subdivision (d) as attached to counts 3, 4 and 5. Frank concedes, the People agree, and we concur, that reversal of the gang enhancement allegations do not impact this enhancement. (*Lopez, supra*, 73 Cal.App.5th at p. 348 ["[T]hose findings under section 12022.53, subdivision (d), which carry the same penalty, remain intact."].)

As to appellants, the jury also found true the special circumstance allegation attached to count 3 that Xusha's murder was "intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person or persons outside the vehicle with the intent to inflict death." (§ 190.2, subd. (a)(21).) Haddock contends that this enhancement must be vacated along with the gang-related firearm enhancements. Haddock relies on *Lopez, supra*, 73 Cal.App.5th 327, which involved an enhancement under subdivision (a)(22) of section 190.2 that provides: "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang.'" The *Lopez* court vacated this gang murder special circumstance because it expressly incorporated provisions of section 186.22. (*Lopez*, at p. 348.)

In contrast, the true findings as to the special circumstance allegation under section 190.2, subdivision (a)(21) did not depend on a finding that either appellant was an active participant in a criminal street gang, or that

72

the Xusha's murder was carried out to further the activities of a criminal street gang. Accordingly, the sentence enhancement related to the true findings for this allegation are not impacted by the changes to section 186.22 under Assem. Bill 333.

## XII. *APPELLANTS' REQUESTS TO CONSIDER WHETHER TO STRIKE OR MODIFY ONE OR MORE FIREARM ENHANCEMENTS*

### A. *Additional Background*

The information alleged that appellants were principals in the charged offenses and at least one principal personally and intentionally discharged a firearm, causing great bodily and death (§ 12022.53, subds. (d) & (e)(1)). The jury returned true findings on these allegations. At sentencing, Haddock's counsel noted that the court had "discretion to strike the [section 12022].53 [allegations]. I would ask the court to consider striking the .53s . . . in Mr. Haddock's particular case. I think there is a question, certainly, in 2011 as to whether he pulled a trigger that killed somebody; and in 2013 we know he wasn't the triggerman." Frank's counsel similarly asked the trial court "to exercise discretion on the [section 12022].53 allegations." The trial court responded: "I'm going to hold, basically, that particular issue to the specific sentencing determination, and we'll see how the Court rules on that."

When sentencing Haddock, the trial court found that the evidence "overwhelming[ly]" supported the verdicts. The trial court struck Haddock's prior strike and the 15 years that would be added for Haddock's nickel priors but stated *"I can't go any further than that, and I'm not inclined to go any further than that,* because the time has come, basically, now to atone for the events that you've been convicted of." (Italics added.) The court then imposed on Haddock three consecutive 25-year-to-life terms for the firearm enhancements for counts 1, 3, and 5 (staying the firearm enhancements on

counts 2 and 4 pursuant to section 654).  The court did not expressly address the issue as to Frank but implicitly denied the motion by imposing the full term of 25 years to life for the allegation on all counts and the minimum parole period of 15 years for counts 3, 4, and 5.

B. *Analysis*

Assuming the trial court's action can be construed as an implied denial of their requests to strike the firearm enhancements, appellants note that the trial court did not mention its discretion to modify, as opposed to striking the firearm enhancements, to something less than three 25-year to life sentences or its awareness of this discretion.  They contend that the trial court was unaware of its discretion to modify or impose a lesser gun enhancement pursuant to section 1385 as observed in *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*) and a remand is appropriate so the trial court can exercise its discretion in this regard.  If we deem this sentencing issue forfeited, appellants argue that they received ineffective assistance of counsel and request relief on that basis.

The People agree that under *Morrison*, *supra*, 34 Cal.App.5th 217, a trial court can impose a lesser uncharged enhancement after striking an enhancement under section 12022.53, subdivision (d).  (*Morrison*, at pp. 222–223.)  However, the appellate court in *People v. Tirado* (2019) 38 Cal.App.5th 637 (*Tirado I*) came to the opposite conclusion, finding that a trial court has no discretion to modify a gun enhancement if a lesser enhancement has not been charged.  (*Tirado I*, at pp.  643–644, review granted Nov. 13, 2019, S257658.)  The People argue that appellants forfeited this claim because both *Morrison* and *Tirado I* had been issued by the time of the sentencing hearing; thus, appellants cannot assert that the trial court was unaware of *Morrison's* holding.  Assuming we decline to find the issue forfeited, the People argue

74

that *Tirado I* is the better reasoned decision and we should decline to follow *Morrison*. Finally, assuming we address the merits and determine that the trial court was unaware of its discretion to impose a lesser included firearm enhancement, the People assert that the error was harmless beyond a reasonable doubt.

Our Supreme Court recently held *Morrison*, *supra*, 34 Cal.App.5th 217 "correctly described the scope of a trial court's sentencing discretion under section 12022.53." (*People v. Tirado* (2022) 12 Cal.5th 688, 946 (*Tirado II*).)[23] *Morrison* was decided just over six months before appellants' sentencing hearing and *Tirado I*, *supra*, 38 Cal.App.5th 637 was decided approximately two months before sentencing. Therefore, we presume both the trial court and trial counsel were aware of the split of authority. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114 [on appeal, " 'a trial court is presumed to have been aware of and followed the applicable law' "].) Accordingly, any claimed " ' "error must be affirmatively shown." ' " (*People v. Giordano* (2007) 42 Cal.4th 644, 666; *People v. Leon* (2016) 243 Cal.App.4th 1003, 1026 (*Leon*) ["Relief from a trial court's misunderstanding of its sentencing discretion is available on direct appeal when such misapprehension is affirmatively demonstrated by the record."].) On this record, we find no forfeiture.[24]

---

23    We allowed the parties to file supplemental briefs on the impact of *Tirado II*, *supra*, 12 Cal.5th 688, if any, to the arguments on appeal. We received and considered those submissions.

24    Because we conclude that appellants' claims are cognizable on appeal, we do not address their alternative argument that their respective trial counsel was constitutionally ineffective for failing to request a lesser gun enhancement.

Sentencing in this case took place nine months after publication of *Morrison, supra,* 34 Cal.App.5th 217. Nonetheless, appellants' probation reports are silent on whether the trial court had the discretion to impose a lesser firearm enhancement. Rather, appellants' probation reports expressly stated that section 12022.53 allegations added "25 years to life." The People's sentencing memoranda similarly stated that appellants should receive a 25 years to life sentence on the section 12022.53 allegations. The trial court indicated that it read these reports and the People's sentencing memoranda to prepare for sentencing. Additionally, appellants' respective defense counsel did not inform the court during the sentencing hearing that it had the discretion to modify or impose a lesser firearm enhancement pursuant to section 1385 and *Morrison*.

This record shows that both parties appeared to assume that the section 12022.53 allegations mandated a 25 years to life sentence. Additionally, the trial court showed no awareness that it had the discretion to impose a lesser firearm enhancement. This record strongly suggests that the trial court was unaware of its sentencing discretion and that appellants are entitled to a limited remand to give the trial court an opportunity to exercise its sentencing discretion. (*Leon, supra,* 243 Cal.App.4th at p. 1026.) "[A] court that is unaware of its discretionary authority cannot exercise its informed discretion." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.)

Although the People disagree, we conclude the record does not clearly indicate that a remand would be futile. Regarding Haddock's sentence, the trial court indicated a willingness to impose a reduced sentence by striking a strike prior and the nickel prior enhancements. The trial court made no comments regarding Frank which might suggest that a remand would be futile.

Because the failure to exercise discretion implicates due process concerns, and to forestall unnecessary claims of ineffective assistance of counsel, on remand the trial court may exercise its discretion with respect to the personal use firearm enhancements under section 12022.53, subdivision (d) found true as to Frank attached to counts 3, 4 and 5. As we discussed above in part XI.D, we must reverse appellants' gang-related firearm enhancements. (§ 12022.53, subds. (d) & (e)(1).) Should the People retry these enhancements and the enhancements are found true, we express no opinion how the trial court should exercise its sentencing discretion on remand.

## DISPOSITION

The jury's true findings on the gang enhancement allegations (§ 186.22, subd. (b)) and the gang-related firearm enhancements (§ 12022.53, subds. (d) & (e)(1) attached to each count as to both appellants are vacated. The portion of the criminal justice administration fee imposed on appellants by the trial court pursuant to Government Code section 29550 that remains unpaid as of July 1, 2021, is vacated. Haddock's parole revocation restitution fine imposed pursuant to section 1202.45 is stricken and the trial court is directed to redetermine its award of Haddock's custody credits in accordance with the views expressed herein.

The matter is remanded to the trial court for further proceedings. The People shall have 60 days from the date of the remittitur in which to file an election to retry appellants on the vacated enhancements. If the People elect not to retry them, the trial court shall modify the judgments by striking the enhancements and shall resentence appellants accordingly. At resentencing, (1) appellants shall have the opportunity to request a hearing on their respective inability to pay court-imposed fines, fees and assessments, (2) the trial court

may exercise its sentencing discretion with respect to the personal use firearm enhancements under section 12022.53, subdivision (d) found true as to Frank attached to counts 3, 4 and 5, and (3) the trial court shall determine Haddock's custody credits.

Following the conclusion of proceedings, the trial court shall amend the abstracts of judgment and forward copies of the amended abstracts to the appropriate law enforcement and custodial officials.  In all other respects, appellants' judgments are affirmed as modified.

O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


BUCHANAN, J.

78